Henry J. HOLT and Myrtis Holt, Plaintiffs,

v.

FERDON EQUIPMENT CO. and Eaton Corporation, Defendants.

Henry J. HOLT and Myrtis Holt, Plaintiffs,

v.

HERCULES, INC., Defendant.

Civ. Nos. 1004–73, 1247–73.

United States District Court, D. New Jersey.

Nov. 12, 1976.

Shanley & Fisher, Newark, N. J., for plaintiffs Holt.

Kirkpatrick & Rathman, Rumson, N. J., for defendant Ferdon.

Webb, McDermott & McGee, Millburn, N. J., for defendant Eaton.

Carpenter, Bennett & Morrissey, Newark, N. J., for defendant Hercules.

Meth & Wood, Newark, N. J., for defendant Raybestos.

## MEMORANDUM

BIUNNO, District Judge.

The facts alleged by the pleadings in these consolidated cases should be summarized at the outset. Holt claims to have been injured on February 11, 1972 when a bale of cotton linters fell on him from a load on a fork-lift truck he was operating in the Raybestos warehouse, causing serious injury.

Holt filed two suits in this district, one against Eaton (which manufactured the fork-lift) and Ferdon (the dealer through whom Raybestos bought it), and the other against Hercules (which had sold the cotton linters to Raybestos). Both suits charge

negligence and were ordered consolidated for all purposes.

Eaton and Hercules have each filed third-party complaints bringing in Raybestos as a third-party defendant, seeking several kinds of relief from it if each is found liable to Holt. Raybestos, in turn, has moved before answer to strike the third-party complaints under F.R.Civ.P. 12(b)(6) for failure to state any claim on which relief can be granted. The motion is mainly grounded on the proposition that as between Raybestos and Holt, the incident was an industrial accident compensable under workmen's compensation statutes which, under applicable law, are said to bar any claim over against it. Eaton and Hercules respond with the assertion that the applicable law does not bar the claim over, and that if it does, it thereby violates the equal protection and due process clauses of the Constitution of the United States.

As noted below, the briefs have discussed the law of both New Jersey and Connecticut, as the question of conflict of laws is still open. When the briefs were received, the Supreme Court of New Jersey had not ruled on a number of the points involved, and the court was aware that an appeal was pending there from a trial court ruling that could help resolve the tenor of local law on at least some issues. That matter was decided and reported in the advance sheets of August 13, 1976, *Schweizer v. Elox, etc.*, 70 N.J. 280, 359 A.2d 857 (1976), and this memorandum is prepared in light of that ruling, among others.

## THE UNDERLYING LAW

Although a claim is made that these cases are governed by Connecticut law, the briefs discuss more of the New Jersey law and provide relatively little of the statutory pattern and statutory history in Connecticut.

New Jersey is a common law State; it has preserved that status in its three constitutions. See N.J.Const.1776, Art. XXII; N.J.Const.1844, Art. X, § 1; N.J.Const.1947, Art. XI, § I, par. 3. The briefs imply that Connecticut is also a common law State in the same sense, but none provides the source references.

At common law, the respective rights, duties, liabilities and defenses as between master and servant for injury to the servant were well-established. It would be useful for the purpose of analysis to have an articulation of the major features of that substantive law, but the briefs have not attempted to do so.

In any event it is known that in 1911 New Jersey enacted its workmen's compensation statute, one of the first (if not the first) in the Nation, c. 95, L.1911, now NJSA 34:15–1 *et seq.* The scheme of that statute was to declare its provisions to be implied as part of the contract of employment, NJSA 34:15–7, and allowed the parties to agree expressly that the implied terms were not part of the contract, NJSA 34:15–9. In the latter case, the rights, duties, liabilities and defenses remained as at common law except for some which the statute modified or abolished in any case. See NJSA 34:15–1 and 2.

The net effect, where the implied terms applied, was to obligate the employer to compensate the worker for injury "arising out of and in the course of" the employment, both in cases where the employee could have recovered at common law and where he could not. In exchange for this vicarious obligation, the law limited the amount of recovery to allowances set by schedule in the statute.

Also, to guarantee that the employee would in fact receive the scheduled amounts without regard to the financial ability of the employer, the law (since 1917) required the employer to obtain insurance for his obligations under the law, NJSA 34:15–70, et seq., (except where self-insurance was authorized in individual cases, NJSA 34:15–77).

By c. 174, L.1913, NJSA 34:15–40, a provision was added that if the employee should obtain recovery for his injury from some outside party, i. e., not under the workmen's compensation law, the employer was entitled to be reimbursed for his payment to the employee.

This brief review indicates an array of potential sets of circumstances. In case 1, if an employee is injured by an event arising out of and in the course of his employment, the employer must pay him according to the schedule, and cannot be obliged to pay him more. In sub-case 1A, that is the result even though the injury was the employer's fault under common law, and in sub-case 1B, it is also the result even though the employer was not at fault.

In case 2, if an employee is injured in an event involving an outside party, he will recover in sub-case 2A if the outside party was negligent (and the negligence was a proximate cause), but will not recover in sub-case 2B if the outside party was not negligent in this sense.

In case 3, if an employee is injured in an event involving an outside party who is negligent (and the negligence is a proximate cause) he will recover in sub-case 3A if the employee himself is not contributorily negligent but will not recover in sub-case 3B if he is contributorily negligent in this sense.

Cases where the employee makes a claim against an outside party will either involve an injury embraced by the workmen's compensation law, or one that is not. Even for injuries outside the workmen's compensation act, the outside party may be his own employer. For example, if MacPherson had been an employee of the Buick Motor Car Co. and had been injured by reason of a defect in the Buick he bought from a dealer, he could recover in a common law action against his own employer under the principle of *MacPherson v. Buick*, 217 N.Y. 382, 111 N.E. 1050 (1916) despite the existence of a workmen's compensation law. This would be due to the fact that the injury did not arise "out of and in the course of" the employment, but outside of it.

Similarly, if an employee buys a power tool for his home workshop from an outside party, and is injured because of a defect in the machine, he can sue and recover from the manufacturer. And, at least in some jurisdictions, the manufacturer may seek indemnity from the injured party's own employer if the employer supplied the outside manufacturer with the defective part that caused the injury. The claim over may be asserted through a third-party complaint in the original suit by the injured party, or in a later suit for indemnity. In the latter situation the injured party's employer may be bound by the outcome of the first suit if he is properly "vouched in", as noted in *U.S. Wire and Cable Corp. v. Ascher Corp.*, 34 N.J. 121, at 126, 167 A.2d 633 (1961). And, see also, N.J. Evid.Rule 63(21).

In New Jersey, this pattern of common law plus workmen's compensation law has been complicated by two statutory enactments. The first is c. 335, L.1952, NJSA 2A:53A–1, et seq., which alters the common law to provide for contribution between joint tort-feasors. The second is c.146, L.1973, NJSA 2A:15–5.1 et seq., which substitutes "comparative negligence" for the common law rule of contributory negligence.

In Connecticut, the briefs imply that the common law rule forbidding contribution between joint tort-feasors has not been altered, but that if a suitable independent relationship exists, recovery may be had by way of indemnity from a party who also happens to be a joint tort-feasor. None of the briefs discloses whether the common law rule that bars recovery for contributory negligence has been altered or not.

Putting aside for the moment the potential impact of a workmen's compensation law, it is evident from these examples that an outside party may recover over to one extent or another on different legal grounds. If the sole basis for the claim is joint negligence, there cannot be a recovery over where the common law rule forbidding contribution remains in force, and there can be where contribution is allowed by statutory change in that principle. And, where the claim has some legal ground other than that of joint negligence, recovery over is allowable on that ground even though the parties also happen to be joint tort-feasors.

The sharpest example of this concept dealt with by the briefs is the decision in *Stevens v. Polinsky*, 32 Conn.Sup. 96, 341

A.2d 25 (Sup. New London, 1974). In that case, an employee of a tenant was injured by reason of the defective condition of a ramp. The employee sued the lessor for her injury. The lessor filed a third-party claim against the employer/lessee for indemnity. The jury's verdict on the main claim was for the employee, and on the third-party claim was for the lessor. The basis for the recovery over (which was not merely for the contributory share of a joint tort-feasor but for the whole loss and the expense of defending the claim) was grounded on the lessor/lessee relation. The court's opinion found a basis for recovery over in a provision of the lease obliging the employer/lessee to make and pay for inside maintenance and repairs. But the same result would follow from the common law relation of landlord-tenant, especially in cases where the letting is for the entire land and building, because the common law puts the duty of repair and maintenance on the party that has the right of possession and use, in the absence of an express provision to the contrary. This is no more than a common sense recognition of the fact that the person having the right of possession and use has full control over them and has a general duty to all invitees who may otherwise be injured or damaged to see that the use is reasonable and proper, and that the effects of wear and tear which are the inevitable result of use are neutralized by proper repair and maintenance.

The fact that *Stevens* happened to involve a lessor/lessee relation is not significant. As is typical of the case theory of the common law, it is a decision exemplifying (by induction) a general rule, which is not confined to the particular details involved in a specific case.

Thus, the court cannot accept the argument by Raybestos that the independent relation arising out of a letting is *ipso facto* inapplicable to a sale. A letting of realty or a bailment of personalty retains title in the lessor or bailor, and transfers to the tenant or bailee the right of possession and use. A sale always transfers this right and the ownership as well. Since the duty found in *Stevens* was grounded in the right to possession and use, the same duty obviously exists in a sale, which necessarily embraces a transfer of the same right. The duty cannot be said rationally to be non-existent merely because the sale transfers not only the right of possession and use but title as well. If anything, the rationale for the duty is stronger in the case of a sale than it is in the case of a letting or bailment.

Thus, if the fork-lift truck had been obtained by Raybestos on a bailment, it is obvious that the principle of *Stevens* would apply. Absent an express undertaking by the bailor, Raybestos as bailee would have a duty to maintain and repair and to make reasonable use of the equipment. The transfer of ownership, along with the right of possession and use could not possibly have reduced or eliminated that duty.

The significance of *Stevens* is not that it was decided in the context of an employee's work-related injury, but that the result was reached despite the fact that Connecticut law evidently does not allow contribution between joint tort-feasors.

The case of *A.A. Equipment, Inc. v. Farmoil*, 31 Conn.Sup. 322, 330 A.2d 99 (Sup. Hartford, 1974) does not reach this question. So far as the opinion discloses, the claim over was no more than for contribution from a joint tort-feasor, which Connecticut law evidently does not allow in any case, whether the workmen's compensation law is involved or not. The right to indemnity arising out of an independent duty was recognized and distinguished, and the rationale of the result was that Connecticut does not allow contribution between joint tort-feasors where that is the only ground of the claim.

In sum, considering the underlying law by itself, the court cannot say that the third-party complaints fail to state a claim.

## THE CONFLICT OF LAW QUESTION

From all appearances as the briefs treat the question, it seems clear that Holt's workmen's compensation claim against Raybestos is governed by the Connecticut

statute. This view, if accepted, does not necessarily control the question of choice of law governing Holt's claims against Eaton and Hercules, or the claims by them against Raybestos. The briefs do not address this aspect.

The clearest illustration of the problem in this case arises from the fork-lift. The present record before trial suggests that Raybestos bought the fork-lift in late 1962 for use in its New Jersey plant. So far as that transaction is concerned, it is likely to have been governed by the former Uniform Sales Act, NJSA 46:30–20, as to any implied warranty of merchantability. See, for example, *Henningsen v. Bloomfield Motors*, 32 N.J. 358, 161 A.2d 69 (1960). In New Jersey, the Uniform Commercial Code, NJSA Title 12A, did not take effect until January 1, 1963, after the fork-lift sale.

In Connecticut, the Uniform Commercial Code was enacted by C.G.S.A. Title 42a to take effect October 1, 1961, before the fork-lift sale.

To the extent that there may be differences between the Uniform Sales Act and the Uniform Commercial Code, it can be important to know whether the law of New Jersey or Connecticut applies as between Holt and Eaton, and as between Eaton and Raybestos. Since the briefs do not address this aspect, it cannot be decided now. Besides, all the court has to work with now are pretrial materials in the main case, since there have been no answers and no discovery on the claims against Raybestos. In addition, it is risky to make a ruling on the law when the facts as established at trial may not be the same as those which appear, on the surface, from the pretrial record.

It should be obvious, from what has been said, that the selection of applicable law may be different on one issue between particular parties than it is on other issues between other parties.

Once a specific jurisdiction has been selected as the source of the controlling law, then the matter of its tenor remains to be established.

In the context of this case, it is a well-known fact that industrial equipment purchased by an enterprise like Raybestos from a manufacturer like Eaton can cover a wide variety of items. If Raybestos buys a drill point, or a grinding wheel, or an electric motor and then applies it to a use for which it is not intended, what are the legal consequences in a case like this?

If an employee is injured at work, then if a workmen's compensation law applies Raybestos must pay compensation. But what is the relation between the employee and the supplier, and between the supplier and Raybestos?

Absent some inherent defect in the item of a kind that would breach the warranty of merchantability, the use of the item by Raybestos for a purpose it was not intended to have would seem to bar recovery by the injured employee against the supplier, either because no negligence can be shown rationally, or because the misuse of the item by Raybestos is an efficient intervening cause. When a supplier sells more than the item itself, and includes a whole package that embraces a known application which it is supposed to be designed to serve, the supplier may be liable for the whole package, items and utility and all. See, for example, *Sperry Rand v. Industrial Supply*, 337 F.2d 363 (C.A.–5, 1964).

But what is the rule in the more common case where the employer buys an item as such, by model and catalog number, with or without available accessories to serve a wide variety of needs, and the supplier has no part of the decision of what to buy? If what is supplied satisfies the order, the buyer has no complaint if the item fails to achieve the work he had in mind, or causes damage when so used. And, if someone is injured in one jurisdiction whose law nonetheless imposes liability on the supplier when the law of the jurisdiction governing the sale does not, does one control the employee's right to recover while the other governs the supplier's right to indemnity?

These are not abstract questions. From what is in the record so far, Raybestos took the fork-lift on some date from New Jersey

to Connecticut. Not only that, but at some time thereafter it is said to have instructed Hercules to ship its cotton linters, not in bales but on pallets of six bales each.

Nothing is suggested to show that the change was made known to Eaton or that Eaton said the fork-lift was suitable for the new use. If Holt can recover from Eaton for his injury under Connecticut law, may Eaton have indemnity from Raybestos under New Jersey law?

In the case of Hercules, the claim is that before changing to the requested six-bale pallet, Hercules asked Raybestos whether it could handle the shipments in this form, and was told it could. If Hercules can be held by Holt, can it recover indemnity from Raybestos under Connecticut law?

As a general proposition, suppliers of equipment or goods to an industrial customer are bound by contract to supply what is called for. Such suppliers have no voice, ordinarily, in the selection of means and methods selected by the buyer in putting the equipment to use or in handling the goods. If it be the case, despite this, that local law allows a recovery by an injured employee against the supplier, is there not an implied duty, arising out of the contractual relation of buyer and seller, that the buyer will indemnify the seller for the damage and expense it is exposed to under local law when the decision as to use or as to method of handling is made by the buyer alone and causes injury despite the fact that the sale contract was properly performed?

For the reasons stated, it is the court's view that the question of applicable law cannot be resolved with confidence now. After answers are filed and discovery is completed on the third-party complaints, it may be possible to do so if the facts governing the issue are not in dispute.

## THE CONSTITUTIONAL ISSUE

As noted above, most of the submissions have emphasized New Jersey law which, it may be, does not apply. Nonetheless, as a guide to the parties, this segment of the presentation will be discussed in the context of New Jersey law.

The question is approached in light of the rule that constitutional questions are not to be dealt with if the dispute can be decided on some other ground.

If it cannot, then the second rule is that a law is not to be found unconstitutional if any reasonable basis to support it can be found, unless the right claimed to be invaded is a fundamental right, in which case the burden is to show a compelling interest to support the law.

Although constitutional issues are raised, neither New Jersey nor Connecticut, through their Governors and Attorneys-General have been notified of the existence of the issue. They probably should be, if the issue becomes a serious one, at least to provide the court with the benefit of views *amicus curiae* unless they choose to remain silent after notice.

The first facet that blinds the eye with its reflection is the question whether the outside party sued by the employee can be bound, in the constitutional sense, by the workmen's compensation disposition. The administrative proceeding ending in that disposition is between the employee, his employer and the latter's insurance carrier. The outside party is neither given notice nor an opportunity to be heard in that proceeding.

Two illustrations will make the point. Suppose an employee on the night shift stops at his local tavern in the afternoon to watch a ball-game with friends, and gets drunk. In New Jersey, he can recover from the tavern for ensuing injury to himself, under the "dram shop" rule. See, *Rappaport v. Nichols*, 31 N.J. 188, 156 A.2d 1 (1959); *Soronen v. Olde Milford Inn*, 84 N.J.Super. 372, 202 A.2d 208 (App.1964), subscribed to, 46 N.J. 582, at 592, 218 A.2d 630 (1966), reversing on other grounds.

Suppose, being drunk, he goes to work and puts his hand in a punch press and is injured. In New Jersey, he cannot recover compensation from his employer if his being

drunk is the natural and proximate cause of his injury, NJSA 34:15–7.

Or, suppose that aside from whatever defect may exist in the punch press, the employee's injury is intentionally self-inflicted. In that case, too, he cannot have compensation from his employer, NJSA 34:15–7.

Suppose, beyond that, that in both kinds of cases, the employer (and its carrier), chooses to "take a dive" in the workmen's compensation case, believing that the statutory compensation schedule sets a cheap cost for the injury, and calculating that the employee can recover all his damage from the tavern or the punch press supplier, and on the advice of counsel that the supplier cannot recover over.

Obviously, in such cases, the outside party cannot be bound by the administrative ruling, on due process grounds. It cannot be unless made a party or "vouched in". If it can establish that the employee was drunk, or that the injury was intentionally self-inflicted, the claim would seem to be outside the workmen's compensation act in New Jersey, and hence the employer could not claim the protection of NJSA 34:15–40.

The second aspect that catches the eye with its reflection arises from the common law and the changes made by the workmen's compensation law and the joint tort-feasors' law, and the comparative negligence law (the last of which is not involved here because of its effective date).

Before these statutory changes of 1952 (contribution between joint tort-feasors) and of 1973 (comparative negligence), the questions posed here could not have arisen absent a right to recover over for indemnity.

In the course of the common law, access to the courts was limited to claims for which a specific writ was recognized. See Sims v. Sims, 79 N.J.L. 577, 76 A. 1063 (E & A 1910); Pound, Spirit of the Common Law, p. 140. The unsatisfied need for access to the courts for redress of grievances that did not match a known writ led to the enactment, in 1285, of the Statute of West-

minster II. The text of its key provision is worth quoting here:

"Whensoever from thence forth in one case a writ shall be found in the chancery and in a like case falling under the same writ and requiring like remedy, no precedent of writ can be produced, the clerks in chancery shall agree in forming a new one; and if they cannot agree, it shall be adjourned to the next Parliament, where a writ shall be framed by the consent of the Learned in the Law, lest it shall happen in the future that the Court of Our Lord the King be deficient in doing justice to the suitors." (Chap. 24).

The phrase "in a like case", in that statute led to the framing of a writ for an "action on the case", which was allowed for the assertion of claims for damage for any wrong to which a writ on an action on covenant, or for trespass, did not apply; that is, for claims where the injury was not from force, and was not direct but consequential only.

See, Harris, Pleading and Practice in New Jersey, (N.J. Law School Press, 1926), § 7, footnote 19.

It is significant, too, that the Statute of Westminster II assigned the primary function of developing new writs to the clerks in chancery. (This was especially appropriate in light of Grotius' definition (based on Aristotle) that: "Equity is the correction of that wherein the Law, by reason of its universality, is deficient". The object of the statute was to prevent a court, for lack of a proper writ, from being "deficient in doing justice to the suitors".

As is well known, actions seeking remedy for wrongs consequential to negligent conduct grew out of the "action on the case." See, Dilts v. Kinney, 15 N.J.L. 130 (S.Ct. 1835).

It was an inherent part of the concept of that action that a person whose negligent conduct was a proximate cause of injury could neither recover for his own injury nor seek contribution from other tort-feasors whose conduct also was a proximate cause of injury to one who was free of negligence. The injured, non-negligent party could have

his remedy from one or more, up to all, of those whose negligent conduct proximately caused his injury. The negligent parties were simply denied any remedy, whether for their own injury or for sharing the liability for injury to a non-negligent claimant.

Within this concept it is plain that who happens to be plaintiff or defendant is an accident determined only by who sues out his writ first. If four persons were negligent, and their conduct was a proximate cause of injury to all of them, no one of them could have a remedy against any other, whether suing as a plaintiff, or counterclaiming or whether seeking contribution against a joint tort-feasor.

Where one injured party was non-negligent, he had his remedy, but the others still had none. Thus, the concept of denying contribution between joint tort-feasors was no more than a special case of the broader view that a wrongdoer was denied any remedy. The rules on contributory negligence, and on contribution between joint tort-feasors, are but subdivisions of the basic principle.

This background explains why, in New Jersey (for example) an outside party sued by an injured employee could not implead the employer on a claim over when that claim amounted to one for contribution from a joint tort-feasor. This was true before the Workmen's Compensation Law was enacted, and it remained unchanged after it was enacted. Thus, the questions posed here could not have arisen in New Jersey before 1952.

Consequently, the issue of an outside party claiming over against the employer as a joint tort-feasor only arose after the 1952 statutory change. When it did arise, the attempt to seek contribution was rejected on the theory that the workmen's compensation claim is not a tort claim; that an employee (whose contract of employment carried the implied terms under NJSA 34:15–7) could not "lawfully maintain an action in tort against his employer, hence the employer is not liable in tort." *Farren* v. *N.J. Turnpike Authority*, 31 N.J.Super. 356, at 361, 106 A.2d 752, at 755 (App.1954).

Examination of the Workmen's Compensation Act as a whole discloses that this expression is less than an accurate description. What the act has done is to say that if the contract of employment is silent on the matter, the employer and employee will be considered to have agreed to the statutory scheme. That scheme amounts to an implied contract to compensate the employee for work-connected injury, according to the schedules of payment, whether the employer would otherwise be liable or not. This amounts to a contract to settle potential tort claims in advance, by trading a fixed schedule of damages for an obligation to pay without proof of employer negligence.

Such contracts to settle claims for personal injury in advance of the injury were not recognized at common law on grounds of public policy, for the same reasons that they could not be assigned until after reduced to judgment. For the different identity of the claims, see *Ochs* v. *Public Service Ry. Co.*, 81 N.J.L. 661, 80 A. 495 (E & A 1911). Such contracts could only be made if authorized by statute. Even after the Practice Act of 1903, which allowed the assignee of "any" chose in action to sue in his own name after the death of the assignor, C.S.1910, p. 4057, § 20, only those tort actions that involved property rights could be assigned, *Gaskill* v. *Barbour*, 62 N.J.L. 530, 41 A. 700 (S.Ct. 1898), citing the predecessor statute.

But contracts for settlement *after* injury, and even while suit is pending, have been governed by a different public policy and have always been recognized as valid even without statutory authority. This policy went so far that a settlement in which a claimant released one joint tort-feasor resulted in the release of all tort-feasors. See *Rossum* v. *Jones*, 97 N.J.Super. 382, 235 A.2d 206 (App.1967); *Breen* v. *Peck*, 28 N.J. 351, 146 A.2d 665 (1958).

With the enactment of the 1952 contribution law, the courts were faced with a new problem, namely how to treat a settlement by a claimant with one joint-tortfeasor

when he presses his claim against others who then seek contribution from the one who settled. The solution arrived at was to decide that in the suit against non-settling defendants, the entire claim would be reduced *pro rata* by the share of the settling defendant, even though the settlement amount was less than the *pro rata* share. *Judson v. Peoples Bank*, 17 N.J. 67, 110 A.2d 24 (1954), and 25 N.J. 17, 134 A.2d 761 (1957). This device made it unnecessary to claim over for contribution against the settling wrongdoer, since that claim was netted out by reduction, *pro rata*, of the main claim.

In *Theobald v. Angelos*, 44 N.J. 228, 208 A.2d 129 (1965) the court faced a different question. There, Theobald sued both Angelos and Anderson for negligence. Anderson settled before trial. Angelos had cross-claimed Anderson. The jury found Angelos was negligent and, in a special verdict, that Anderson was not. Here, the court ruled that Angelos was not entitled to a *pro rata* reduction because of Anderson's settlement, on the ground that the jury's finding that Anderson was not negligent barred treatment of the claim against him as a claim against a "joint tort-feasor". A *pro tanto* reduction for the Anderson payment was allowed by the trial court but the high court ruling did not deal directly with its propriety, 44 N.J. at 236, 208 A.2d 129, footnote 1, although all the cases cited on the point supported that treatment.

What is pertinent here is that New Jersey law evidently is that when a claimant settles with one tort-feasor, his recovery against others is reduced *pro rata*, but if the settlement is with one found not to have been a tort-feasor the *pro rata* reduction is not allowed.

The only difference between that law, and the question involved here, is that when the employer/employee relation is not involved, the contract of settlement is made after injury; while in cases governed by N.J.S.A. 34:15–7, the contract of settlement is made before injury.

If, in both situations, New Jersey allowed a *pro rata* reduction of the litigated claim in cases where the settling party was in fact negligent and the negligence was a proximate cause, but denied the reduction when the settling party was not at fault, no constitutional issue would appear colorable.

But if New Jersey allows the reduction in one case but not in the other, depending on whether the contract of settlement is made after injury or before, serious federal constitutional issues would seem implicated.

Any argument that the Workmen's Compensation scheme in New Jersey does not amount to a contract of settlement in advance is obviously without substance. The act itself is expressly made an implied term of the contract of employment by N.J.S.A. 34:15–7, and it expressly allows the parties to make a different contract, N.J.S.A. 34:15–9.

*Schweizer v. Elox, etc.*, 70 N.J. 280, 359 A.2d 857 (1976), while awaited in the hope that it might provide guidance here, is not helpful. The issue was a very narrow one, namely whether the outside party could seek joint tort-feasor contribution from an employer (indemnity was not involved). The court ruled he cannot, but the analysis is too shallow and the considerations which give rise to the federal constitutional questions are not mentioned, much less analyzed, nor is any note taken of such rulings as *Sunspan, etc., v. Spring-Lock, etc.*, Fla., 310 So.2d 4 (1975), or *Carlson v. Smogard*, 298 Minn. 362, 215 N.W.2d 615 (1974). The facts in *Carlson* are especially instructive.

In any event, no New Jersey court seems to have explored and considered the weighty constitutional questions involved, and so the State court has had no occasion or opportunity to adopt a saving construction. Such construction, if adopted, probably would need to deal with both the Workmen's Compensation Law and the Joint Tort Feasors' Contribution Law, since neither statute on its face bars an outside party's claim over against the employer on a tort theory. The bar, to the extent it exists, arises by virtue of judicial construction of one or the other statute, or of both together.

For that reason, the court abstains from deciding the constitutional issues at this stage.

## OTHER CONSIDERATIONS

The generous construction of the phrase "arising out of and in the course of" the employment, given by the New Jersey courts in allowing workmen's compensation claims, is well and widely known, and hardly needs cataloging here.

One of the extreme cases is *Hornyak v. Great Atlantic and Pacific Tea Co.*, 63 N.J. 99, 305 A.2d 65 (1973), where an employee decided to go out to a restaurant for lunch and was injured in an auto accident. The claim was allowed, even though he was not at work and even though the employer had luncheon facilities at the place of work. The rationale was that there was not provision for "hot" meals.

At least one New Jersey court has drawn the line, it should be said, in disallowing a claim by an employee who was struck in the head by a belligerent pelican while standing in the surf at Miami Beach, during a personal vacation after attending a business convention there, *Yorkin v. Volvo Distributing Co.*, 143 N.J.Super. 474, 363 A.2d 908 (1976), reversing the award granted by the Division of Workmen's Compensation.

So long as a generous construction of the act is confined to the parties to the employer/employee relation, outsiders have no interest in it, except perhaps to the extent that it may increase costs and prices. When it does affect them, they do. In the context of a suit against an outside party, the generous construction can have an effect since the employee realizes nothing unless the recovery is for much more than the workmen's compensation award, even in a weak case.

One question, then, involves a potential due process issue, namely, whether an outside party sued by an employee who has received a workmen's compensation award can lawfully and constitutionally have his rights, status and legal relations affected by the making of a contract between employer and employee (to which he is not privy), or by an award in a proceeding to which he was not a party and in which he had no opportunity to be heard.

Beyond that, the generous construction given to the workmen's compensation law appears to have spilled over to cases against outside parties. Whether this is due to a feeling that the scheduled awards are too scanty in cases of serious injury or death is by no means clear. Whatever the reasons, the judicial attitude is exemplified by *Black v. Public Service, etc.*, 56 N.J. 63, 265 A.2d 129 (1970). There, the employee of a construction company was killed when a crane came in contact with a high-voltage power line. A safety statute, N.J.S.A. 34:6-47.1 et seq., obligated the employer to notify the electric company in advance whenever a crane was to be operated within 6 feet of a high voltage line. The obvious scheme of the law was to enable the electric company to assure safe working conditions by installing mechanical barriers to prevent contact with the crane, or by cutting off power to the line while the crane was being used. The employer never notified the electric company, which did not know the work was going on, and which had installed and maintained its lines in compliance with the National Electrical Safety Code.

Yet, the Supreme Court reversed the judgment of the trial court, after jury verdict for defendant electric company, and remanded for a new (third) trial.

The ruling was the subject of criticism, see editorial, "Some Electrifying Questions", 93 NJLJ 664 (9/17/70).

Over eight years earlier, the extremes reached in supporting awards in heart infarction cases, exemplified by *Dwyer v. Ford, etc.*, 36 N.J. 487, 178 A.3d 161 (1962), led to a suggestion that it would make more sense to allow an employer to provide group life insurance coverage (regardless of work connection) in an amount at least equal to the scheduled award in death cases, in lieu of processing a workmen's compensation claim. See, editorial, "The Industrial Heart Case," 85 NJLJ 244 (5/3/62).

No evaluation has been made by any decision this court has found of the impact of

federal legislation, exemplified by the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq., whose explicit object is the achievement of safe working conditions for the employee.

In this context, the focus of the judicial interpretation by the New Jersey courts has not been one to stimulate safety for the workingman—something which is essentially in the control of the employer—but rather has been one of providing economic compensation for injury, not only from the employer but from outside parties as well. It has also given prominence to the concept that the employer's economic risk is to be limited to the scheduled payments of the workmen's compensation act, reduced to the extent that a recovery from an outside party reimburses the employer's outlay.

The actuarial basis for workmen's compensation insurance is well known. Each annual premium is on an estimate basis, and it is adjusted later on to reflect the actual loss experience for the year. This approach, by itself, is an economic inducement to the employer to reduce premium expense by close attention to safety precautions. Yet, with the proliferation of large claims against outside parties, from which the employer is reimbursed his expense as though the injury never occurred, this economic motivation is reduced.

Beyond that, the same proliferation frustrates the asserted object of the New Jersey courts to hold the employer's economic risk to the scheduled amounts set by the workmen's compensation act, as expressed in *Schweizer, supra.* The reason for this is that each time an employee of X recovers from outside party Y, without contribution or *pro rata* offset for the negligence of the employer, the economic cost is shifted from the negligent employer to someone else who is often also an employer. Thus, the outside party who is an employer is called upon to shoulder the entire economic cost of an injury to someone else's employee without benefit of the limits of the compensation schedule.

In this case, for example, suppose that the injury had occurred because the fork-lift had defective brake linings supplied to Eaton by Raybestos. The position taken by Raybestos would shift the entire economic loss to Eaton, even though defective Raybestos brake linings caused the injury, and even though Raybestos would never be responsible to its own employee for its own defective product for more than the amounts limited by schedule, and if the claim here were to succeed, would pay nothing at all.

## CONCLUSION

For the reasons stated, the motions to dismiss the third-party complaints against Raybestos are denied. The denial is without prejudice to renewal after answer filed and completion of discovery. The potential constitutional questions are reserved.

SO ORDERED.