108 N.J. Super. 137 (1970)
260 A.2d 248
SECURITY ALUMINUM WINDOW MANUFACTURING CORP., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
LEHMAN ASSOCIATES, INC., AND MARK M. GALE, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 3, 1969.
Decided January 6, 1970.
*139 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Melville J. Berlow argued the cause for appellants and cross-respondents.
Mr. Michael A. Querques argued the cause for respondent and cross-appellant (Messrs. Querques, Isles and Weissbard, attorneys; Messrs. Harvey Weissbard and Daniel E. Isles, of counsel and on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
Defendants Lehman Associates, Inc. (herein Lehman or broker) and Mark Gale (herein Gale or salesman) appeal from a judgment of the Chancery Division awarding $4950 in compensatory damages to plaintiff Security Aluminum Window Manufacturing Corporation (herein Security). Security cross-appeals, contending that the trial court erred in failing to award punitive damages against defendants.
In the fall of 1966 Security was in dire financial difficulties; bankruptcy seemed imminent. Stephen Azierski, president of the company, sought to alleviate the problem by either selling or leasing certain corporate property located on Mt. Pleasant Avenue in Newark. To that end an exclusive listing agreement, stating "The sale price shall be $65,000.00, or any other price which the undersigned agrees to accept," was entered into with Lehman, a licensed real estate broker of the State of New Jersey. Negotiations were handled by Gale, Lehman's agent and salesman.
In December of that year Gale informed Azierski that there was a tight market for industrial real estate in the Newark area and advised him of an offer of $25,000 from one Sam Minkowitz. Azierski rejected the offer because it was *140 insufficient and would not cover outstanding corporate obligations.
Security had vacated the property and, while driving by one day during February 1967, Azierski noticed the salesman showing three men around the premises. Upon inquiry Gale told him that the men were in the "letter" business and he would contact Azierski if an offer were forthcoming. About the third week of February, one of the tenants in the building called Azierski and informed him that a Mr. Johnston had been on the premises introducing himself as the new owner. Azierski immediately called Gale and asked about Johnston and whether there had been any favorable developments. Gale replied in the negative and, with regard to Johnston, stated, "Oh, some kook, don't even think about it."
On March 1, 1967 Gale telephoned Azierski and told him that Minkowitz was losing interest in the property and, if he did not accept the offer, he might be unable to find a buyer. What Gale failed to inform Azierski, however, was that Minkowitz was a good friend of Gale's of 40 years' standing; that Mr. Johnston of the Johnston Letter Company had offered $44,000 for the property, which was rejected as insufficient, and that on February 28, 1967 Johnston increased his offer to $50,000 and tendered a deposit of $500.
Azierski, in a financial squeeze having just received service of process in a foreclosure proceeding, reluctantly agreed to accept Minkowitz's offer of $25,000. Gale took an agreement of sale to Azierski's home and the latter once more questioned the salesman as to whether Minkowitz might bid a little higher. When Gale responded "no," Azierski signed the contract dated March 2, 1967.
Meanwhile Johnston, who was never informed by Gale as to the identity of the property owner, was disturbed about the delaying tactics of Gale. After conferring with counsel, Johnston concluded that there was "something fishy going on," and he ascertained that Security was the owner of the property. Johnston then, about the middle of March, called Azierski to find out what was holding up the sale and, at *141 that time, Azierski learned of the $50,000 offer that had been made in February.
Security expeditiously instituted proceedings in the Chancery Division against Lehman, Gale and Minkowitz seeking injunctive relief as well as compensatory and punitive damages. It also finalized negotiations with Johnston direct for a sale of the property at $44,000. By mutual agreement the purchase price was later reduced to $43,000 and title was closed in June 1967.
Defendants Lehman and Gale filed an answer and a counterclaim for commissions allegedly due as a result of the Minkowitz contract, commissions on any sale by Security to Johnston and for damages against Azierski for malicious interference with the proposed sale by Minkowitz to Johnston. In addition, Lehman and Gale sought a temporary restraining order precluding Minkowitz from canceling his agreement with Security. Ultimately, Security paid Minkowitz $1,000 for a cancelation of his contract and, by pretrial order, the action of plaintiff against Minkowitz was voluntarily dismissed with prejudice.
The trial court found and determined that plaintiff was entitled to compensatory damages and computed the amount thereof by taking the $6,000 difference between the Johnston offer of $50,000 and the contract price of $44,000 and subtracting therefrom $1,050, representing sundry repairs (to the boiler, sprinklers and plumbing system) required to be made by the seller according to the terms of the original offer. There is support in the record for this finding and conclusion, and it should not be disturbed. Plaintiff is entitled to compensation for every loss or injury directly or proximately resulting from defendants' wrongful acts. "An injured person is entitled to be made whole." Patusco v. Prince Macaroni, Inc., 50 N.J. 365, 368 (1967); cf. 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 254 (1961). See generally 22 Am. Jur.2d, Damages, "IV. Measure and Elements of Compensatory Damages," § 45, at 71-72 (1965).
*142 We proceed now to consider the plaintiff's claim for "punitive" damages, a term interchangeably known as "exemplary" damages. Generally, they have been awarded only "[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime." See Prosser, Torts (3d ed. 1964), § 2, at 9. A plaintiff is given these awards "over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example." Ibid. See McCormick, Damages, § 77, at 275 (1935).
This court in Winkler v. Hartford Acc. and Indem. Co., 66 N.J. Super. 22, 29 (App. Div.), certif. den. 34 N.J. 581 (1961), said that "[e]xemplary damages are allowed to punish the wrongdoer for a willful act and to vindicate the rights of a party in substitution for personal revenge, thus safeguarding the public peace." Accord, LaBruno v. Lawrence, 64 N.J. Super. 570, 575 (App. Div. 1960), certif. den. 34 N.J. 323 (1961), where the grounds for punitive damages were summarized: "(1) actual malice, which is nothing more or less than intentional wrongdoing  an evil-minded act; or (2) an act accompanied by a wanton and wilful disregard of the rights of another." See generally 22 Am. Jur.2d Damages, § 237, at 323 (1965); Prosser, Torts, supra. Also, Note, "Exemplary Damages in the Law of Torts," 70 Harv. L. Rev. 517 (1957).
In Brown v. Coates, 102 U.S. App. D.C. 300, 253 F.2d. 36, 67 A.L.R.2d. 943 (D.C. Cir. 1958), homeowners sued a real estate broker to recover damages for alleged fraud. The Court of Appeals held that the evidence sustained the findings that the broker induced plaintiffs to enter into a contract for the exchange of their old house for a new one with the resultant effect that they received no money for the equity in their old house, and that the broker was guilty of a breach of trust. The judgment of $7059 compensatory damages and $7500 punitive damages was affirmed. Circuit Judge Burger (now Chief Justice of the United States *143 Supreme Court), writing for the court, pointed out that the federal judiciary has repeatedly recognized the propriety of allowing punitive damages in a civil case as a punishment for, and as a deterrent of, various forms of wrongful behavior. The following language in his opinion is significantly applicable to the facts presently under review:
* * * The types of behavior that courts have considered sufficiently "wrongful" so as to warrant the assessment of punitive damages, have varied greatly. Usually the defendants' actions have been labeled "wilful," or "malicious" or "reckless" or "wanton" or "outrageous."
We need not adopt any single, particular formula in upholding an award of punitive damages against a faithless agent. * * * [O]nce it has been shown that one trained and experienced holds himself out to the public as worthy to be trusted for hire to perform services for others, and those so invited do place their trust and confidence, and that trust is intentionally and consciously disregarded, and exploited for unwarranted gain, community protection, as well as that of the victim, warrants the imposition of punitive damages. * * * Punitive damages are particularly apt in such circumstances because they both punish the wrongdoer, and offer the wronged a greater incentive to bring derelicts to justice a process which can subject the victim to considerable expense and trouble [253 F.2d, at 40]
See Annotation, "Right of principal to recover punitive damages for agents' or brokers' breach of duty," 67 A.L.R.2d 952 (1959). Cf. Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).
A California case, Bate v. Marsteller, 232 Cal. App.2d 605, 43 Cal. Rptr. 149 (D. Ct. App. 1965), involved a somewhat analogous situation. There plaintiffs-vendors were awarded compensatory damages of $14,000 together with punitive damages aggregating $20,000, assessed in various amounts against a licensed real estate broker and three of his agents. In an order denying a motion for a new trial, the trial court reduced the punitive damages to a total of $6,000, which reduction was accepted by plaintiffs. Defendants appealed. The proofs established that the broker knowingly misinformed the vendors, who listed their property for sale at $50,000 to $52,000, that the highest price obtainable was $37,000, and that the sellers were thereupon induced by misrepresentations *144 to sign a sales agreement for the lesser amount. Neither the broker nor his agents disclosed that they were acquiring a joint interest in the property. They fraudulently failed to reveal the ultimate material facts concerning the sale. The appellate court affirmed. After noting that defendants' conduct was unethical, the court stated that exemplary damages were properly awarded to discourage such actions and by way of punishment. It then cited authorities for the proposition that restitution alone would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained. 43 Cal. Rptr., at 159.
The fiduciary responsibility of a broker, which extends to his salesmen, was emphasized by our Supreme Court in Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528 (1967). He is required "to exercise fidelity, good faith and primary devotion to the interests of his principal. * * * [T]he rule which applies to trustees has been equally applied to the relation between the real estate broker and his principal. He must show perfect good faith and openness of dealing" (at 553). Note, "Ellsworth Dobbs, Inc. v. Johnson: A Reexamination of the Broker-Buyer-Seller Relationship in New Jersey," 23 Rutgers L. Rev. 83, 86 (1968). As to the trend in courts of equity awarding punitive damages, especially where the same court administers both legal and equitable relief, see 22 Am. Jur.2d, Damages, § 239, p. 327 (1965); cf. Grillo v. Bd. of Realtors of Plainfield Area, 91 N.J. Super. 202, 232 (Ch. Div. 1966).
Here, the rationale of the trial judge in rejecting plaintiff's claim for punitive damages can best be illustrated by quoting excerpts from his opinion:
* * * the mere fact that Lehman Associates had filed a counterclaim seeking its commissions and seeking aid in the courts should in no way be deemed a ratification of the unlawful or unauthorized act.
I find that no punitive damages will be awarded against Lehman Associates.
*145 Punitive damages are claimed against Mr. Gale. * * * The Real Estate Board, as represented by counsel, has been notified of this transaction. And if I were to award punitive damages in this case it would or might influence the Real Estate Board's determination of the propriety of Mr. Gale's action, and I will undertake to do no such thing. * * * It [the Board] might take his livelihood away. I believe it would be unconscionable for me, under these circumstances, to award punitive damages * * *.
We do not regard such reasons, which are totally apart from the sufficiency of the evidence, as a sound legal premise for the disallowance of punitive damages.
It is well settled in this State and in the majority of jurisdictions that the award of punitive damages is discretionary and not a matter of right. Neigel v. Seaboard Finance Co., 68 N.J. Super. 542, 555 (App. Div. 1961).[1] And see Prosser, Torts, supra.
Discretion, however, means legal discretion in the exercise of which the trial judge must take account of the applicable law and the particular circumstances of the case, to the end that a just result is reached. And, as declared in Master Auto Parts, Inc. v. M. & M. Shoes, Inc., 105 N.J. Super. 49, 53 (App. Div. 1969), "[i]f he goes wide of the mark, the appellate *146 court has a duty to act." See also Sokol v. Liebstein, 9 N.J. 93, 99 (1952); State v. Johnson, 67 N.J. Super. 414 (App. Div. 1961); Borough of Fanwood v. Rocco, 59 N.J. Super. 306 (App. Div.), aff'd 33 N.J. 404 (1960); Kavanaugh v. Quigley, 63 N.J. Super. 153 (App. Div. 1960). In Kavanaugh we observed that if the trial judge misconceives the applicable law or misapplies it to the factual complex, the exercise of his discretion in effect "lacks a foundation and becomes an arbitrary act, however conscientious may have been the judge in the performance of it." Id., at 158.
The broker in the instant matter was relieved from punitive damages because the proofs did not establish an awareness of "each and every fact" involved in the challenged transactions of its salesman. The trial judge opined in substance that the pleadings should not be deemed a ratification of the alleged unlawful or unauthorized conduct of Gale. We disagree.
Exemplary damages may be recovered against an employer who specifically authorizes, participates in or ratifies a wrongful act of his employee. See Winkler v. Hartford Acc. & Indem. Co., supra; Restatement, Agency 2d, § 217 C (1958). Ratification has been defined as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Id., at § 82. Section 97 of that work reads:
There is affirmance if the purported principal, with knowledge of the facts, in an action in which the third person or the purported agent is an adverse party:
(a) brings suit to enforce promises which were part of the unauthorized transaction or to secure interests which were the fruit of such transaction and to which he would be entitled only if the act had been authorized; or
(b) bases a defense upon the unauthorized transaction as though it were authorized; or
(c) continues to maintain such suit or base such defense.
*147 Stated differently in Story, Agency (5th ed. 1857), § 139, at 163, it is a "sound and perfectly well-settled principle, that if a principal seeks to enforce a contract made by his agent, he is as much bound by any material misrepresentation made therein by the agent, as if made by himself. In Bleyer v. Veeder, 119 N.J. Eq. 398, 406 (Ch. 1936), it was held that "A principal claiming the benefit of his agent's unauthorized act thereby ratifies that act and is bound by it."
Here the broker not only attempted by its joint answer to defend the actions of Gale, which were specified in plaintiff's complaint, but it also sought to benefit from the illegal transaction by counterclaiming for commissions due as a result of the alleged fraudulent sale to Minkowitz and also the ultimate sale to Johnston. Moreover, the broker claimed damages against plaintiff for malicious interference with the prospective sale from Minkowitz to Johnston. Additionally, although defendants state in their brief that they accept the ruling of the trial court dismissing the counterclaim, they argue that plaintiff suffered no compensatory damages and, in doing so, assert various adjustments and credits in their favor, including an item of $2500 for "commission."
We hold that Lehman's ratification of Gale's misconduct was unequivocal and patent.
The trial judge, as indicated above, disallowed punitive damages against Gale on the theory that any disciplinary action by the Real Estate Commission would be sufficient punishment and, if such damages were allowed, it might influence the decision of the Commission. The judiciary should not speculate on the outcome of a complaint addressed to the discretion of an administrative agency. Indeed, we were advised at oral argument that the Commission had not yet taken action upon the charges filed with it against defendants. In any event, a license revocation would not necessarily be a sufficient alternative. See Brown v. Coates, supra, 253 F.2d, at 40, n. 15.
*148 In short, when exemplary damages are justified, they should not be withheld merely because a civil or criminal penalty has been or may be imposed. This point was made clear in Morris v. MacNab, 25 N.J. 271, 281 (1957), where it was argued that an award of exemplary damages for conduct of a defendant who had already been the subject of criminal conviction would subject him to "punishment twice for the same offense." There it was noted that the courts throughout the country have generally rejected such a contention, citing Morris, "Punitive Damages in Tort Cases," 44 Harv. L. Rev. 1173, 1196 (1931). See also McCormick, Damages, supra, § 82, at 292.
Gale's behavior was not only wrongful but it was willful and constituted a most reprehensible violation of his fiduciary trust. His conduct as revealed by the record makes applicable the long-since written words of Mr. Justice Story in The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 558, 4 L.Ed. 456, 459 (1818), "this must be pronounced a case of gross and wanton outrage, without any just provocation or excuse."
In the circumstances it is plain that punitive damages should be assessed against both defendants and, in the exercise of our original jurisdiction, we make such a finding and determination. R. 2:10-5.
Accordingly, the matter is remanded for a hearing to determine the amount of punitive damages to be awarded plaintiff, taking into consideration the character of defendants' acts, the nature and extent of the harm to plaintiff, and the wealth of the respective defendants. 4 Restatement, Torts, § 908, at 554 (1939). They may bear some reasonable proportion to the actual damages. McCormick, Damages, supra, "Manner of Determining Amount," pp. 296-298. In all other respects the judgment of the trial court is affirmed.
NOTES
[1] Some jurisdictions by decisional fiat, absent statutory provisions providing for punitive damages, have rejected such damages entirely. See e.g., Anderson v. Dalton, 40 Wash.2d 894, 246 P.2d 853, 35 A.L.R.2d 302, 305 (Sup. Ct. 1952); City of Lowell v. Massachusetts Bonding & Ins. Co., 313 Mass. 257, 47 N.E.2d 265, 272, 146 A.L.R. 750, 759 (Sup. Jud. Ct. 1943); McCoy v. Arkansas Natural Gas Co., 175 La. 487, 143 So. 383, 85 A.L.R. 1147, 1152 (Sup. Ct.), cert. denied 287 U.S. 661, 53 S.Ct. 220, 77 L.Ed. 570 (1932); Hall v. Rice, 117 Neb. 813, 223 N.W. 4, 78 A.L.R. 1421, 1423 (Sup. Ct. 1929). Contrariwise, other states impose a duty on the court or jury to award punitive damages upon proof of requisite assertions. See e.g., Davenport v. Woodside Cotton Mills Co., 225 S.C. 52, 80 S.E.2d 740, 744 (Sup. Ct. 1954); Wilcox v. Southern Ry Co., 91 S.C. 71, 74 S.E. 122, 125 (Sup. Ct. 1912); McAllister v. McAllister, 72 Colo. 28, 209 P. 788 (Sup. Ct. 1922). Connecticut is unique in that it allows punitive damages, but such amount may not exceed the amount of plaintiff's litigation expenses less taxable costs. Doroszka v. Lavine, 111 Conn. 575, 150 A. 692, 693, 69 A.L.R. 1279, 1281 (Sup. Ct. Err. 1930).