Ray FERGUSON, Plaintiff-Appellant,

v.

OVERHEAD DOOR COMPANY OF SPRINGFIELD, INC., Defendant-Respondent.

No. 10001.

Missouri Court of Appeals, Springfield District.

March 16, 1977.

Motion for Rehearing or Transfer Denied April 11, 1977.

Application to Transfer Denied May 10, 1977.

Herbert Douglas, Douglas, Douglas & Douglas, Neosho, B. H. Clampett, Daniel, Clampett, Ellis, Rittershouse & Dalton, Springfield, for plaintiff-appellant.

Donald E. Bonacker, Jerry L. Reynolds, Springfield, for defendant-respondent.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

Plaintiff Raymond Ferguson, a licensed real estate broker, brought this action to recover a commission allegedly due him from defendant Overhead Door Company of Springfield, Inc., by reason of a sale by defendant to Jack Webb of an improved lot (5204 Range Line) in Joplin, Missouri. The sale price was $22,000 and the petition sought a six percent commission of $1,320.

As a defense to the petition, and as the basis for its counterclaim for actual and punitive damages, defendant alleged that plaintiff failed to disclose the existence of a higher offer ($25,500), that offer being available at the time defendant, without knowledge of its existence, accepted Webb's $22,000 offer on November 30, 1973.

In February 1975 the case was tried to a jury which denied plaintiff relief on his petition and awarded defendant $3,500 actual damages and $5,000 punitive damages on its counterclaim. Plaintiff appeals.

In general plaintiff's points on appeal lie in three areas: (a) The trial court erred in permitting defendant to introduce Exhibit F, a written statement which defendant's witness Ralph Hamlin gave defendant's attorney on December 3, 1973; (b) Instructions 4 and 6, offered by defendant, were erroneous for several reasons; (c) The evidence is insufficient to support the award of punitive damages.

In the order of their appearance in the following summary, the persons involved are:

1. Ferguson—plaintiff Raymond Ferguson;

2. Datema—Pete Datema, president of the corporate defendant, whose office is located in Springfield, Missouri. Datema represented the defendant throughout the described dealings and his authority so to do is not questioned;

3. Beal—Bob Beal, a business associate of Carroll Dale;

4. Dale—Carroll Dale, a bidder on the lot;

5. Hamlin—Ralph Hamlin, a self-employed Joplin real estate broker;

6. Dykes—Jim Dykes, a real estate salesman in the employ of Ferguson;

7. Webb—Jack Webb, the ultimate buyer of the lot.

November 23, 1973: In a telephone conversation Ferguson and Datema agreed

that Ferguson would have "an exclusive listing" to sell the lot for a commission of six percent, the listing price to be $27,500. Ferguson, who had had two prior listings of the lot from Datema, placed his real estate sign on it.

November 24, 1973: Beal and Dale talked with each other about buying the lot.

November 25, 1973: Dale telephoned Hamlin, whom Dale had previously used as his agent in real estate matters, and asked Hamlin to "see about buying the property for Dale."

November 26, 1973: (1) Ferguson mailed Datema an "exclusive listing" form confirming the oral arrangements of November 23. This form was never signed by Datema; (2) Hamlin telephoned Ferguson's office and talked to Dykes; Dykes said Ferguson would be happy to cooperate with Hamlin on a sale of the lot; Hamlin requested the key to the building on the lot and Dykes, who did not then have the key, agreed to obtain one for Hamlin; (3) Hamlin "showed the lot" to Dale, the showing being limited to the outside because no key was available.

November 27, 1973: Both in the morning and in the afternoon Hamlin telephoned Dykes to see if Dykes had obtained the key, but Dykes had not. Hamlin "said something about his prospect" to Dykes but did not identify the prospect. Dale crawled into the building on the lot and inspected it.

November 28, 1973: (1) Hamlin called Dykes and renewed the request for the key; (2) Ferguson talked with Webb; Webb made a verbal offer of $22,000 and gave Ferguson a $500 earnest money down payment; the down payment was in cash and not by check; (3) Ferguson telephoned Datema and informed Datema of Webb's $22,000 offer. Datema said he would have to check with his associates and call back; (4) Hamlin called Dykes about the key; (5) Datema called Ferguson late in the afternoon and told him the Webb offer was acceptable.

November 29, 1973: (1) Dale (and his wife) signed a written contract on a form provided by Hamlin. The contract called for a purchase price of $25,500 and a real estate commission of $1,530 to be paid Hamlin "in cooperation with Raymond Ferguson Agency"; (2) Hamlin called Dykes about the key; (3) In the afternoon Hamlin telephoned Ferguson's office and was informed Dykes was gone. Thereafter Hamlin tried to reach Ferguson at his office "every 30 minutes" and, after 6:30 p. m., repeatedly tried to reach Ferguson at his home; (4) Beal and Dale went to Ferguson's office at 7 p. m. and told Ferguson's secretary they wanted to talk with Ferguson; (5) Ferguson had a telephone conversation with Beal in which Beal said that he, Beal, was not interested in buying the lot. Ferguson tried, without success, to telephone Dale, Ferguson then being of the opinion that Dale was a prospective buyer; (6) At 10 p. m. Hamlin had a telephone conversation with Ferguson. The particulars of this conversation, which involve the admissibility of Exhibit F, will be treated later.

November 30, 1973: (1) Ferguson tried without success to reach Dale by telephone; (2) Ferguson dictated the Webb contract and it was typed on a form provided by Ferguson, calling for a sale of the lot to Webb for $22,000 and a commission to Ferguson of $1,320; (3) Webb went to Ferguson's office and signed the Webb contract; (4) Ferguson went to Springfield and talked with Datema. Ferguson admitted that he told Datema that, other than the Webb contract, "I had no firm offers, people discussed it but no money up, no prospective buyers"; (5) Datema, for defendant, signed the Webb contract late Friday afternoon.

December 3, 1973: (1) Datema telephoned Ferguson and said he "was dissatisfied because there had been another offer"; (2) Datema, for defendant, hired an attorney who sent a letter to Ferguson "terminating Ferguson's authority"; (3) Defendant's attorney interviewed Hamlin and obtained his written statement, "Exhibit F."

In February 1974 the Webb contract was carried out except that Ferguson was not paid his commission.

The first point to be considered is whether the trial court erred in permitting the introduction into evidence of defendant's Exhibit F, the body of which was in the attorney's handwriting.

At the trial Hamlin testified as a witness for defendant. In most respects his trial testimony was consistent with the contents of Exhibit F. The major difference between Exhibit F and the trial testimony of Hamlin pertains to the contents of the telephone conversation which Hamlin had with Ferguson at 10 p. m. on November 29. According to Exhibit F, Hamlin told Ferguson that he, Hamlin, "had a contract for $25,500 to buy the property." If Exhibit F was in fact inadmissible, the rest of the record falls short of containing that item of evidence.

Plaintiff's first witness was Ferguson himself. On direct examination he testified that at no time prior to the signing of the Webb contract did he have any knowledge "of any offer of any amount from anyone other than Webb."

On cross examination Ferguson testified that he did not know that Hamlin was showing the lot or that Hamlin had a prospective buyer. He did, however, admit having the telephone conversation with Hamlin on the evening of November 29. When asked if Hamlin told him at that time that Hamlin had a prospective purchaser, Ferguson's nonresponsive answer was "the conversation was very short." Pressed by defense counsel, Ferguson admitted that he *did* know Hamlin was showing the lot and that Ferguson was mad at Hamlin for doing so.

Ferguson also made the following admissions: he felt an obligation to Datema to get the highest price available; he had a duty "to tell my client everything I knew about the sale that might influence his decision on whether or not to sell"; if anyone else was interested in buying, it was his duty to transmit that information to the seller; he told Datema, before Datema signed the Webb contract, that he had received "no firm offers, people discussed it but no money up or firm offer that I could

hope to tell him we might have a prospective buyer"; he did not tell Datema about the telephone conversation with Hamlin; although he was of the opinion that Dale was a prospective buyer, and he had failed in his attempts to reach Dale, he did not tell Datema about Dale or those attempts; if the Dale "deal" had gone through, defendant would have received, for the lot, $3,500 more than it received on the Webb contract; Ferguson's commission under the Webb contract was about $500 more than it would have been if the Dale deal had gone through because, in the latter event, Hamlin would have been entitled to a portion of the commission.

On redirect examination Ferguson stated that Hamlin did not, in the telephone conversation, reveal "the name of any prospect or any offer he might have."

As part of its case defendant called Hamlin as a witness. With regard to the telephone conversation, Hamlin testified that Ferguson expressed outrage that Hamlin was showing the lot without Ferguson's permission. Hamlin said that caught him by surprise *and I don't recall the next few words of the conversation. The last I can recall is I said I had a party that was interested in the property which I thought would be a good deal . . . I felt from the indication and the tone of [Ferguson's] voice that—and I was tired and did not want to fight any longer . . . and I just said, 'well, if your deal does not work out would you give me a call.'*"

On cross examination Hamlin testified that the reason he called Ferguson was to discuss the Dale contract "but I never did explain it to him." On further questioning by Ferguson's counsel, when asked whether he had disclosed the amount of Dale's offer to Ferguson, Hamlin replied that he could not recall "if I did or didn't."

On redirect examination the witness testified that he was under medication for a heart condition. Defendant's counsel then had Hamlin's written statement marked as Exhibit F. Hamlin testified that he had read and signed the statement, that he had corrected it in several places and initialed

the corrections, and that it was an accurate record, made on December 3, 1973, of the facts set forth in it and that those facts were true when he signed it.

Exhibit F was admitted into evidence and defendant's counsel was permitted to read it to the jury. The trial court commented that the exhibit was "admissible for two purposes: one, it is a recorded history of past recollection at a time close to the time of the transactions in question and, second, it appears to the court that from the questions and answers and the demeanor of the witness on the stand that the witness was adverse and was not a friendly witness."

The only objection to Exhibit F was this statement by plaintiff's attorney: "We object to defendant's Exhibit F for the purpose of trying to impeach his own witness." There was no objection to the introduction of Exhibit F on the ground that it failed to qualify for admissibility as "past recollection recorded."

On this appeal plaintiff argues that Exhibit F, and more particularly that portion of it to the effect that Hamlin told Ferguson of the $25,500 offer, "is not evidence of probative value." Defendant relies upon a principle stated in *Rogers v. Fiandaca*, 491 S.W.2d 560, 565 (Mo.1973) to this effect: "[W]here the use of prior inconsistent statements becomes proper to impeach a witness by proof of his prior contradictory extrajudicial statements, nevertheless such statements are hearsay and they are admissible *only* for the purpose of impeachment and are not to be taken as substantive and affirmative proof of the facts stated therein."

Plaintiff's argument proceeds upon the assumption that Exhibit F was merely an impeachment device and was not substantive evidence. It is not necessary to rule whether or not Exhibit F was used as an impeachment device and, if so, whether that use was proper[1] under the circumstances. This is true because, as will be seen, Exhibit F was admissible as a past recollection recorded. "If proffered evidence is admissible for any purpose, it may not be excluded . . . in such event the one objecting to the evidence may ask a limiting instruction, if desired." *Martin v. Mercantile Trust Co.*, 293 S.W.2d 319, 329[14] (Mo.1956).

Clearly under the liberal view of the rules pertaining to the admission of a memorandum as a past recollection recorded, Exhibit F was admissible and was substantive evidence. Case law and text writers disagree to some extent upon what must be shown in order to render a memorandum admissible as a past recollection recorded.[2] The Supreme Court of Colorado has stated the general rule in the following language:

"A past recollection recorded meets the requirements for admissibility when it appears that the witness (1) can identify the memorandum, (2) adequately recalls the making of it at or near the time of the event, either as recorded by himself or by another, and (3) can testify to its accuracy." *Jordan v. People*, 151 Colo. 133, 376 P.2d 699, 702 (Banc 1962).

The Colorado court held that it was not necessary to show that the witness (whose description of the facts is contained in the memorandum) must fail to have his memory refreshed by the memorandum before the memorandum itself may be read to the jury. Quoting authorities from other jurisdictions and Wigmore on Evidence, the Colorado court said at p. 703: "We are persuaded that admissibility of a past recollec-

---

1. See *Mooney v. Terminal R. Ass'n of St. Louis*, 352 Mo. 245, 176 S.W.2d 605, 611[13, 14] (1944); *State v. Castino*, 264 S.W.2d 372, 375[6] (Mo.1954).

   If Exhibit F was properly used as an impeachment device, authority exists to the effect that the failure of Ferguson's attorney in the trial court to request an instruction limiting the purpose and effect of Exhibit F to impeachment only deprives plaintiff of the right to complain on appeal "of any affirmative probative force the jury may have attributed to the impeaching statement." *Fisher v. Williams*, 327 S.W.2d 256, 262[9] (Mo.1959).

2. See 29 Am.Jur.2d Evidence §§ 876, 877, p. 976; Anno. 82 A.L.R.2d 473 at p. 525 et seq.; McCormick on Evidence (2d) § 299, p. 712; Jones on Evidence, 5th Edition, Vol. 4, § 974, pp. 1831, 1833, note 18; Wigmore on Evidence (Chad. Rev.), Vol. III, pp. 77–125.

tion recorded does not depend upon the absence of a present recollection."[3]

On oral argument on appeal, Ferguson's counsel was asked if he took the position that any of the Missouri requirements with regard to "past recollection recorded" had not been met. In response he mentioned only the element which the Colorado court, and its line of cases, specifically rejected. Some Missouri cases dealing with "past recollection recorded" are cited below.[4] As has been mentioned, at the trial, Ferguson's counsel made no such objection to Exhibit F; its admissibility as *past recollection recorded* was not then attacked on any ground.

■■■ Hamlin identified Exhibit F, although not in his handwriting,[5] as a memorandum signed by him, corrected and initialed by him in several places, accurately recording the facts (including the contents of the telephone conversation with Ferguson) as he knew them to be on December 3, less than four days after the conversation had taken place. This being so, Exhibit F in itself was competent and substantive evidence. Even if proof of the element rejected by Colorado be required in Missouri, it is

present because Hamlin, at the trial, had no memory of whether, in the telephone conversation, he told Ferguson of the $25,500 offer. Finally, the admission of Exhibit F was a matter largely within the discretion of the trial court, *State v. Johnson*, 286 S.W.2d 787, 794[15] (Mo.1956) and there has been no showing of abuse of that discretion. Wigmore on Evidence (Chad. Rev.), Vol. III, § 755, p. 124.

Plaintiff's second point on appeal is that the trial court erred in giving, at the instance of defendant, Instruction 4 and Instruction 6 on several grounds. Instruction 4 was a verdict-directing instruction for defendant on plaintiff's petition.

The first alleged deficiency in Instruction 4 is that there was no evidence to support the submission "that plaintiff failed to disclose an offer to buy the lot for $25,500." Plaintiff argues that Exhibit F was not admissible and thus there was no evidence that plaintiff knew of the $25,500 offer. This argument lacks factual support for the reason that this court has held that Exhibit F was admissible and was proof of plaintiff's knowledge of that offer. Plaintiff admitted that he did not disclose any offer to Datema other than the Webb offer.

---

**3.** Wigmore on Evidence (Chad. Rev.), Vol. III, § 738, p. 91, in discussing past recollection recorded says: "A faithful memorandum should be acceptable, not conditionally on the total or partial absence of a present remnant of actual recollection in the particular witness, but *unconditionally*; because, for every moment of time which elapses between the act of recording and the occasion of testifying, the actual recollection must be inferior in vividness to the recollection perpetuated in the record."

In semi-support of that statement Wigmore cites *State v. Harris*, 334 Mo. 38, 64 S.W.2d 256 (1933). Wigmore says: "Thus, even though the witness has testified from present recollection, it should be permissible *also to introduce a book or memorandum* which satisfies the ensuing rules. This record serves to corroborate his present testimony; common sense dictates this." Wigmore summarizes the ruling in *Harris*: "Robbery; on the issue of alibi, a radio repairman in another city testified by deposition that the accused was in his shop on the day in issue; the repairman's account book was then admitted."

Referring to the requirement of the absence of present recollection Wigmore says: "It should be regarded as an inferior qualification

unknown to the orthodox doctrine and unapproved by good sense."

**4.** *Watson v. Meredith Development Co.*, 410 S.W.2d 338, 341[4, 5] (Mo.App.1966); *State v. Patton*, 255 Mo. 245, 164 S.W. 223, 225, 226 (1914); *Eberson v. Continental Investment Co.*, 130 Mo.App. 296, 109 S.W. 62, 66 (1908). These cases discuss the distinction between *use* of a memorandum to refresh a witness's *present* recollection and *introduction* of a memorandum as *past recollection recorded.*

**5.** Wigmore on Evidence (Chad. Rev.), Vol. III, § 748, p. 101: "[T]estimonial assertion of correctness being all that is needed, it is generally immaterial whether the witness was or was not *the person who actually wrote* or printed the record. It may have been manually prepared by another; but from the moment when the witness saw it and passed judgment upon its correctness, it became for him a correct record. As the mere fact of his writing it would count for nothing in itself, so the mere fact of his not having been the writer is immaterial."

To similar effect see 81 Am.Jur.2d, Witnesses, § 452, p. 460.

■ Plaintiff next claims that Instruction 4 required the jury to find a fact which had not been pleaded. Although plaintiff claims that there was no proof of the mentioned fact, a review of the evidence shows that it has evidentiary support. That issue, having been tried by the express or implied consent of the parties, is treated in all respects as if it had been raised in the pleadings. Rule 55.33(b).

■ Other alleged deficiencies in Instruction 4 need not be considered for the reason that they were neither set forth in plaintiff's motion for new trial nor otherwise brought to the attention of the trial court. *Chambers v. K. C.*, 446 S.W.2d 833, 840[8, 9] (Mo.1969); *Bower v. Hog Builders, Inc.*, 461 S.W.2d 784, 797[4] (Mo.1970); Rules 78.07 and 84.13(a) V.A.M.R.

■ Plaintiff's criticisms of Instruction 6 need not be considered for the reason that Instruction 6 is not "set forth in full in the argument portion of the brief." Rule 84.-04(e) V.A.M.R.

Plaintiff's third point on appeal is that the evidence is insufficient to support an award of punitive damages and that Instruction 9, offered by defendant, which permitted an award of punitive damages, should not have been given. Plaintiff does not attack the form of Instruction 9, nor does he contend that the amount of punitive damages awarded was excessive. He asserts that an award of punitive damages in any amount was not justified.

In general Instruction 9 authorized an award of punitive damages if the jury found the following: when Datema signed the contract, plaintiff knew there was an offer of $25,500 to buy the lot; plaintiff knew that such information would have been material to Datema's decision to sign the Webb contract and deliberately failed to give Datema that information; Datema would not have signed the contract if plaintiff had given him the information; such conduct on the part of plaintiff was willful, wanton, or malicious; as a direct result thereof defendant was damaged. Instruction 9 also contained a definition of the word "malicious."

Plaintiff relies upon *Smith v. Piper*, 423 S.W.2d 22 (Mo.App.1967) and particularly this language appearing at p. 27: "But for narrow exceptions not present here, our courts have repeatedly held that punitive damages do not lie for breach of contract." In *Smith* it was the broker himself who sought punitive damages against his seller who had bypassed the broker and dealt directly with the buyer. The factual situation in *Smith* is distinguishable from the one here. There was no showing, in *Smith*, that the seller deliberately made a misrepresentation to the broker upon which he relied to his detriment.

There existed between plaintiff and defendant a fiduciary relationship, one of trust and confidence, under which plaintiff "was obligated to be perfectly frank" with defendant, to make full disclosure of all material facts, "to strictly avoid misrepresentation," and "in all respects to act with the utmost good faith and fidelity" in the interest of defendant, his principal. *Groh v. Shelton*, 428 S.W.2d 911, 916[9] (Mo.App. 1968).

"The paramount and vital principle of all agencies is good faith, for, without it, the relation of principal and agent could not well exist. So sedulously is this principle guarded that all departures from it are esteemed frauds upon the confidence bestowed." *Van Raalte v. Epstein*, 202 Mo. 173, 191, 99 S.W. 1077, 1081 (1906).

In *Economopoulos v. Curls*, 377 S.W.2d 522 (Mo.App.1964) plaintiffs-landowners recovered actual and punitive damages against a real estate broker with whom they had listed their land for sale. The broker had informed plaintiffs that he had a purchaser who was willing to pay $7,000 when in fact the purchaser was willing to pay $9,900. The matter of punitive damages was submitted to the jury under Instruction No. 3 which told the jury that if they found the issues in favor of plaintiffs under Instruction No. 1 (the verdict-directing instruction on actual damages), and if they further found that the defendant acted willfully, maliciously and intentionally to

deceive the plaintiffs, punitive damages could be assessed. The court of appeals, in affirming the awards, said that Instruction No. 3 was "in a form often approved" and added "certainly, under the evidence, the trial court committed no error in giving it." See also *Sunset Acres Motel, Inc. v. Jacobs*, 336 S.W.2d 473, 483[17] (Mo.1960).

Other jurisdictions which have considered the matter have approved the awarding of punitive damages in actions brought by a principal against a real estate broker who proved faithless to his trust. *Brown v. Coates*, 102 U.S.App.D.C. 300, 253 F.2d 36 (1958); *Security Alum. Wind. Mfg. Corp. v. Lehman Assoc., Inc.*, 108 N.J.Super. 137, 260 A.2d 248 (1970); *Briggs v. Rodriguez*, 236 S.W.2d 510 (Tex.Civ.App.1951). See 67 A.L. R.2d 952 (right of principal to recover punitive damages for broker's breach of duty) and 7 A.L.R.3d 693 (liability of real estate broker to principal for concealing or failing to disclose offer).

The author of the opinion in *Brown* is now Chief Justice of the United States. At p. 39 the court said:

"For breaches of contract standing alone, punitive damages are generally not recoverable. Moreover, it is axiomatic that punitive damages are 'not favored.' Some courts have refused to allow the imposition of punitive damages in *any* contract actions, regardless of the types of contracts involved or the circumstances surrounding their breach."

"We join with those courts which decline to follow such mechanical classification. We believe the better view to be that in certain, narrowly defined circumstances, where a breach of contract merges with, and assumes the character of, a wilful tort, calculated rather than inadvertent, flagrant, and in disregard of obligations of trust punitive damages may be assessed."

The *Brown* court pointed out that it was not adopting any "single particular formula" in upholding punitive damages against a faithless agent, and that each case must be considered on its own peculiar facts. The court then added at p. 40: "But once it has been shown that one trained and experienced holds himself out to the public as worthy to be trusted for hire to perform services for others, and those so invited do place their trust and confidence, and that trust is intentionally and consciously disregarded, and exploited for unwarranted gain, community protection, as well as that of the victim, warrants the imposition of punitive damages. . . . Punitive damages are particularly apt in such circumstances because they both punish the wrongdoer, and offer the wronged a greater incentive to bring derelicts to justice, a process which can subject the victim to considerable expense and trouble."

From the evidence the jury could find that Hamlin told Ferguson that he had a contract for $25,500 to buy the lot; that the following day Ferguson, with knowledge of the existence of that offer, made no mention of it to Datema and in fact told Datema that no such offer existed; that Datema, relying on that misrepresentation, executed the Webb contract and thereby sustained an actual loss by not taking advantage of the higher offer. Under the foregoing authorities, the award of punitive damages was justified.

The judgment is affirmed.

All concur.