COLLEEN CLARK KAHALILI, PLAINTIFF-APPELLANT, CROSS-RESPONDENT, v. ROSECLIFF REALTY, INC., DEFENDANT-RESPONDENT, CROSS-APPELLANT.

Argued March 3, 1958—Decided May 5, 1958.

596

*Mr. Sigmund Auerbach* argued the cause for plaintiff-appellant and cross-respondent.

*Mr. Walter G. Winne* argued the cause for defendant-respondent and cross-appellant (*Messrs. Winne & Banta,* attorneys).

The opinion of the court was delivered by

HEHER, J. We certified for appeal, on plaintiff's petition and defendant's cross-petition, 25 *N. J.* 297 (1957), a judgment for plaintiff on a jury verdict in an action in

tort for negligence by the defendant in the operation of a roller coaster as an entertainment device at its Palisades Amusement Park on the Hudson River in Bergen County, New Jersey. Plaintiff was thrown from the vehicle as it descended the railway by force of gravity on a "ride" known as the "Cyclone," for which she had paid the patron's fee, and was severely injured. The mishap occurred April 23, 1954, between 3 and 4 P. M.

The trial judge denied defendant's motion for a new trial on the asserted ground that the verdict was against the weight of the evidence. A verdict for plaintiff on a prior trial was set aside on that hypothesis.

The Appellate Division, 46 *N. J. Super.* 1 (*App. Div.* 1957), found that the evidence raised an issue for the jury as to the use of reasonable care in the inspection of the apparatus and causation, and the verdict would be sustainable were that the sole criterion, but that it was reversible error to submit "another theory of liability to the jury under the doctrine of *res ipsa loquitur.*" The holding in this behalf was that there was no warrant in the proofs for the trial court's conclusion that there was "that kind of occurrence insofar as the roller coaster itself, as distinguished from the plaintiff, over whom defendant had no control, was concerned," *i. e.,* "one 'which in the ordinary course of things would not take place if the person in control were exercising due care' "; and it could not be known whether "in finding for the plaintiff, the jury was relying on the evidence of specific negligence as to the loose bar or the circumstantial evidence of negligence constituted by the doctrine of *res ipsa loquitur,* both theories being allowed by the court's charge," and as it may have been the latter, there was prejudicial misdirection.

By the cross-petition for certification, defendant urged that, if certification be granted, "it should bring up the whole record and determine the law regarding *res ipsa loquitur* and its application," and if cross-certification is granted, "there should be argued also" the question of the propriety of the trial judge's refusal to dismiss the action at the

conclusion of plaintiff's case and at the close of the whole case, and to set aside the verdict as contrary to the weight of credible evidence.

We shall not consider whether cross-certification is needed to this end. Ordinarily, it is open to the respondent to sustain the reversal upon any ground argued in the intermediate appellate tribunal, even though not there considered or found not good cause for reversal.

These are the essential facts: the device consists of a train of three open cars, coupled together, three successive seats in each car, each seat equipped with a stationary "safety bar" extending laterally "directly above the seat * * * over [the seated passenger's] thighs," moving by force of gravity and momentum on tracks with sharp dips and curves; at the entrance or left-hand side of the car, "the bar is angled off so that a passenger may enter the car"; one "cannot walk directly into that car"; one "must step into the car, step down in the car, and sit in the seat and slide over"; the right-hand side of the car "facing forward * * * is closed"; the safety bar is not movable by the passenger in its normal state; when the car "travels along the straightaway," it is "naturally level across"; the cars "are banked [on a curve] to hold the person or the object that is being carried square with the track"; the track "is banked"; the passenger "is sitting square, * * * sitting square with the track"; that "is done to counteract the centrifugal forces which would naturally throw the person—not throw them, but move their body towards the outside of the curve"; each coaster "is designed for the certain spot"; in "this case, the open side of the car is always on the inside of the curve"; the "high part of the bank is the closed side of the car"; and the "centrifugal forces operate on the passenger * * * towards the closed side."

All this came from one McKee, a mechanical expert associated with defendant, who had designed the device in 1944. His experience covered 51 years in designing, building or operating roller coasters, some 300 in number.

Apparently, the seat bar was intended to keep the passenger in a secure position while the train was in motion. No doubt, the passenger would instinctively take hold of the bar during the movement of the train. But there was nothing by way of notice or warning to indicate that manual attachment to the bar was a safety measure; indeed, it is clear that this course was not deemed necessary to avert danger. On the other hand, there was a posted warning to the patron not to stand in the car but to remain seated.

The bar was so placed that, in its fixed position, it would protect the passenger against forcible expulsion on one side, but not on the other. And so, the patron could enter and leave the car from but one side, where the bar was set at a sufficient distance from the side of the car to permit his movement into and out of the car.

The evidence establishes, as the jury could and no doubt did find, that plaintiff was seated and not standing in the car when she was hurled to the runway. Plaintiff had taken a ride with a male companion which was without incident; she remained for another ride alone, but it was not taken in the same car, she said; she "moved back 3 or 4 seats"; the price was paid to the attendant at the platform; when the train reached the "top of the incline," she "took hold of the bar"; "the bar was loose," and she let go and "held onto the sides of the car, to both sides"; "[the bar] jiggled back and forth"; she "held on that way for some time, and [she] was being pushed back and forth in the car"; she turned to "some young ladies riding in a car in back of [her]," still "holding * * * onto the back of [the] seat," and tried to "let them know of the difficulty," and "then suddenly [she] felt a different lurch, rather strong, and [she] went out of the car"; it "was a different lurch and a sudden lurch"—"a different lurch than the turns or the curves that you go around."

Plaintiff testified that she did not stand in the car; and in this she was corroborated by the three girls in the car to the rear, called as witnesses by defendant, one a daughter of a park employee, all guests of the park management at

the time. All three testified that while seated (she did not stand at any time), plaintiff was thrown from the car. One said that she "was sitting there swaying back and forth in the car \* \* \* she was sitting on the side where you get in the car, and as the car went around the turn, she slid to the side and went out under the bar head first." Another "saw her go over the bar and out through the side"; and the third said "she fell over the bar \* \* \* she went over the bar." All three agreed that she "was swaying back and forth"; it seemed to be a new experience for her, one that gave concern, and they told her "to hold on"; they themselves found it necessary to "hold on" because of the speed and sway in descent. She held the bar "with one hand" for a time. These girls, 17, 18 and 19 years of age, were frequently there as guests of the park management and they had ridden on the roller coaster "many times."

Defendant also offered evidence designed to show that after the mishap the bar was in its normal rigid state; but there was a real question as to whether the car inspected was in fact the one occupied by plaintiff on the second ride, and in any event the issue was peculiarly the jury's province.

Moreover, defendant's specialist, McKee, testified that if the passenger remains seated in the car, "there is very little likelihood of the passenger falling out"; "[i]f the passenger remains seated in the car, with or without that safety bar, they (sic) would come home." The purpose of the bar, the witness said, is "to prevent a person, a passenger, from standing up"; "[t]hey can get partly up, but that throws the center of gravity higher"; "[w]hen they hit a curve, it has more force to throw them out"; "[i]f they remain in the seat, they must come home"; a strap is used on "kiddy cars because at times we have little children"; "[w]e tried years ago to strap the people in on a roller coaster; the straps were all right, but the passengers once in a while would unbuckle the strap."

We do not have here an assumption of inherent and obvious and necessary dangers, as in *Murphy v. Steeplechase Amusement Co.*, 250 *N. Y.* 479, 166 *N. E.* 173 (*Ct. App.* 1929),

invoked by defendant, but rather a use so fraught with danger of serious bodily harm as to justify the belief that precautions of some kind must have been taken to avert it, as in *O'Callaghan v. Dellwood Park Co.*, 242 *Ill.* 336, 89 *N. E.* 1005, 26 *L. R. A., N. S.*, 1054 (*Sup. Ct.* 1909), cited by Cardozo, C. J., in *Steeplechase.* In *Dellwood Park Co.*, the instrumentality was a scenic railway in an amusement park; and the standard of duty was declared to be the same as that applicable to common carriers of passengers, that is, to exercise the "highest degree of care and caution" for the safety of its passengers and to do all that "human foresight and vigilance could reasonably do" to that end, "consistent with the mode of conveyance and the practical operation of the railway." It was stated as the basic hypothesis that where " 'the danger is great, the utmost care and diligence must be employed,' " and in such cases " 'the law requires extraordinary care and diligence,' " citing *Treadwell v. Whittier*, 80 *Cal.* 574, 22 *P.* 266, 5 *L. R. A.* 498 (*Sup. Ct.* 1889): and it was inquired—"Why is not this rule applicable to those operating cars upon a scenic railway, such as the one [there] in question? The passengers carried therein are subject to great risk of life and limb. The steep inclines, sharp curves, and great speed necessarily are sources of peril."

In a word, the standard of conduct laid down by the law is care commensurate with the reasonably foreseeable risk of harm, such as would be reasonable in the light of the apparent risk; for negligence is essentially a matter of risk, that is to say, of recognizable danger of injury. And there are compelling considerations of social, moral and ethical principle and policy for according protection to others against the reasonably foreseeable risk of death and severe bodily injury. Duty is largely grounded in the natural responsibilities of societal living and human relations, such as have the recognition of reasonable men; and fulfillment is had by a correlative standard of conduct. Compare *Imre v. Riegel Paper Corporation*, 24 *N. J.* 438 (1957). See also *Schellack v. Biers*, 109 *N. J. L.* 61 (*E. & A.* 1932);

*Zappala v. Stanley Company of America,* 124 *N. J. L.* 569 (*E. & A.* 1940); *Friel v. Wildwood Ocean Pier Corporation,* 129 *N. J. L.* 376 (*E. & A.* 1943); *Griffin v. De Geeter,* 132 *N. J. L.* 381 (*E. & A.* 1945); *Prosser on Torts* (*2d ed.*) §§ 30, 36.

It was plainly a question for the jury as to whether defendant had failed in its duty to safeguard and protect plaintiff against the mishap which befell her, as a reasonably foreseeable risk; and Judge Waesche's submission of the issue was in accordance with basic principle. He stressed plaintiff's burden of proving negligence by the defendant which was the proximate cause of the casualty; he adverted to the evidence tending to show that the seat bar was loose and the need of causation if such were found to be the fact due to defendant's negligence, also to plaintiff's failure to use the bar, stating the inquiry in this regard to be whether "an ordinary reasonably prudent person [would] hold onto this bar for his own protection," and the rule of assumption of known and obvious risks and the effect of contributory negligence by the plaintiff. In delineating the duty of care, he referred to the defendant's own expert opinion evidence that "when it is operated, a person could sit and ride in the car without the bar and come home safely" and the fact that plaintiff was thrown from the car when, as she said, there was a "sudden lurch, a different lurch than ordinary at a turn, * * * one which is different from the ordinary running of the car," opposed to which was the denial of "any such sudden lurch" by the girls who were seated to her rear, and he said "there is a question of fact there." He continued thus: where "there is a device such as this * * * which is under the management or control of the defendant or his servants, and there is an occurrence which is injurious to the plaintiff which, in the ordinary course of events, would not take place if the person in control were exercising due care, the occurrence itself, in the absence of explanation by the defendant, affords *prima facie* evidence that there was want of due care"; reference was again made to the evidence that if the roller coaster "is operated in its

usual way, in which it was designed to operate, a person could sit in there without a bar and ride around safely," and the "sudden lurch," but he made it clear that the ultimate inquiry was whether plaintiff had proved "by the greater weight or by the preponderance of the evidence that the defendant was guilty of negligence which was the proximate cause of this accident."

Holding that "Had the looseness of the bar been the only theory upon which the jury was permitted to find liability, a jury verdict for the plaintiff would be supportable," the Appellate Division rejected the "doctrine of *res ipsa loquitur*" as another and different theory of liability, inapplicable to the circumstances of this case.

Proceeding on the hypothesis that in addition to the element of control, this maxim has no application unless the "injurious occurrence" be one "which in the ordinary course of things would not take place if the person in control were exercising due care," citing *Mumma v. Easton and Amboy R. Co.,* 73 *N. J. L.* 653 (*E. & A.* 1906), the court could not find in the evidence "any justification for the trial court's conclusion that there was that kind of occurrence insofar as the roller coaster itself, as distinguished from the plaintiff, over whom defendant had no control, was concerned": and it was held that "By the use of language like 'sudden lurch,' 'different than the turns or curves you go around,' and 'rather strong,' plaintiff was not, in our judgment *communicating the fact of an aberration* from the normal operation of the coaster sufficient to invoke the rule of *res ipsa.*" "This verbiage," it was said, "is but a mixture of naked conclusion and subjective impression," and "We cannot, of course, know whether, in finding for the plaintiff, the jury was relying on the evidence of specific negligence as to the loose bar or the circumstantial evidence of negligence constituted by the doctrine of *res ipsa loquitur,* both theories being allowed by the court's charge."

But in this there is a misconception of the essential quality of the rule of evidence embodied in the maxim. *Res ipsa loquitur*—"the thing, or affair, speaks for itself"

—symbolizes a permissible presumption of negligence from the plaintiff's proof, that is to say, an allowable inference of the defendant's want of due care where (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect. The rule has its foundation in probability and the procedural policy of placing the onus of producing evidence upon the party who is possessed of superior knowledge or opportunity for explanation of the causative circumstances. The presumption arises where the circumstances furnish reasonable grounds for the inference that if due care had been practiced by the person having control of the instrumentality causing the injury, the mishap would not have occurred. If the circumstances are such as will, unexplained, sustain the inference of negligence as reasonably probable, a *prima facie* case is made, and the issue goes to the jury. But the burden of persuasion is not thereby shifted; the inference is still one for the jury and not for the court, and the jury may reject it as not of such quality as would move reasonable men to judgment in favor of the tendered hypothesis, even when there is no explanation by the defendant. The most that is required of the defendant is explanation, not exculpation; and where there is an explanation, it is for the jury, as in the ordinary case, to determine the facts and the inferences to be drawn from all the circumstances. The explanation may leave the mind in equipoise and the defendant would then be entitled to a verdict for the failure of the plaintiff to prove his case by the weight of the evidence. Under the maxim, negligence may be a permissible inference so as to take the case to the jury, but it is not a necessary one. *Bornstein v. Metropolitan Bottling Co.*, 26 *N. J.* 263 (1958).

Here, there was, from plaintiff's proof, a presumption or inference of negligence to carry the case to the jury; and defendant, by way of explanation, offered evidence designed to show due inspection of the apparatus, just a few days

before, after the winter's layoff, conceded to have been an imperative duty, and that plaintiff could not have been hurled from the car had she been seated, and then, from its own witnesses, adduced evidence that she had in fact been seated at the critical time and throughout the ride; and so the jury could well conclude, as it did, that fault imputable to the defendant was a just and reasonable inference from all the circumstances, the more probable hypothesis for a happening that is not ordinarily to be expected if there be due care for the passenger's security.

The mishap itself was an unusual occurrence, an extraordinary deviation from the normal in the operation of the coaster, but not beyond reasonable foresight according to the admission made in defendant's own case of an earlier use of safety belts.

 Negligence may be established by proof of circumstances in all cases. Ordinarily, "it is not the injury, but the manner and circumstances of the injury" that justify the conclusion of negligence; and where the defendant "has knowledge of a fact but slight evidence is requisite to shift on him the burden of explanation," and therefore, in proper cases, the jury may be permitted to infer negligence from the accident and the attending circumstances in the absence of an explanation. These are general rules, applicable wherever issues of fact are to be determined. *Griffen v. Manice,* 166 *N. Y.* 188, 59 *N. E.* 925, 52 *L. R. A.* 922 (*Ct. App.* 1901); *Goldstein v. Pullman Co.,* 220 *N. Y.* 549, 116 *N. E.* 376, *L. R. A.* 1918B, 1060 (*Ct. App.* 1917). Compare *Battschinger v. Robinson,* 83 *N. J. L.* 739 (*E. & A.* 1912). "Reasonable probability" is the standard of persuasion, that is to say, evidence in quality sufficient to generate belief that the offered hypothesis is in all human likelihood the fact. Culpability may be postulated from the nature of the physical causes of the particular injury. See *Cleary v. City of Camden,* 118 *N. J. L.* 215 (*Sup. Ct.* 1937), Perskie, J., affirmed 119 N. J. L. 387 (*E. & A.* 1938).

 Negligence was fairly deducible from all the circumstances at the close of the case. Compare *Cicero v. Nelson*

*Transportation Co.,* 129 *N. J. L.* 493 (*Sup. Ct.* 1943). It was the province of the jury to determine whether the evidence sustained the circumstantial inference embodied in the presumption. *Bornstein v. Metropolitan Bottling Co., supra.*

And this is the essence of what the judge told the jury.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division of the Superior Court is affirmed; and the cause is remanded for proceedings accordingly.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice WACHENFELD—1.