GNOC CORP., t/a Golden Nugget, Plaintiff,

v.

Shmuel ABOUD, Defendant/Third Party Plaintiff,

v.

Louis A. TREVISAN, M.D. and Francisco Serrano, M.D., Third-party Defendants.

Civ. A. No. 85–3005.

United States District Court, D. New Jersey.

June 21, 1989.

Greenberg, Margolis, Ziegler, Schwartz,
Dratch, Fishman, Franzblau & Falkin,

P.A., Roseland, N.J. by Thomas Hendrickson, Stephen N. Dratch, and Horn, Kaplan, Goldberg, Gorney & Daniels, P.C., Atlantic City, N.J. by Stephen M. Horn, for plaintiff.

Goldman & Goldman, P.A., West Orange, N.J. by Richard M. Goldman, Steven F. Goldman, Vincent E. Ludwig, for defendant/third-party plaintiff.

Francis & Berry, Morristown, N.J. by Evelyn Farkas, for third-party defendants.

## OPINION

COHEN, Senior Judge:

Before us in this negligence, breach of contract, indemnification, fraud, malicious conduct, medical malpractice and gambling debt action are three motions to dismiss various aspects of the case. The suit was initiated by the plaintiff, GNOC Corp. (Golden Nugget Operating Corporation), an entity doing business in Atlantic City, New Jersey as the Golden Nugget Hotel and Casino ("Golden Nugget"), to recoup $28,-000 from defendant Shmuel Aboud ("Aboud"), which sum represents the alleged account outstanding from his stay at the Golden Nugget from February 19, 1985 through March 4, 1985. Mr. Aboud in turn counterclaimed against the Golden Nugget for, *inter alia,* compensatory damages for gambling losses in the amount of $250,000, and punitive damages. Mr. Aboud also interposed Louis A. Trevisan, M.D., and Francisco Serrano, M.D., as third-party defendants for alleged negligence and/or medical malpractice. Again, as remuneration for the injuries allegedly suffered, Mr. Aboud seeks, *inter alia,* compensatory damages for his $250,000 gambling losses, plus punitive damages against these doctors.

The Golden Nugget has brought two motions for partial summary judgment. The first seeks to dismiss Mr. Aboud's counterclaim on the ground that (a) the Golden Nugget cannot be liable under the doctrine of *respondeat superior* because the wrongful acts of its employees, if any, were outside the scope of their employment, and (b) the Golden Nugget neither authorized, ratified or participated in any of the allegedly wrongful activities committed by its employees, and therefore, under basic agency principles, cannot be liable for punitive damages. The second, filed on short notice, seeks partial summary judgment with respect to ordinary negligence on the ground that the Golden Nugget had no legal responsibility for Mr. Aboud's gambling losses, or in the alternative, should such a legal responsibility be ascribed to the Golden Nugget, under the facts of this case which remain uncontested, the Golden Nugget may be answerable to Mr. Aboud under fraud and intentional negligence theories, but not ordinary negligence. Finally, third-party defendants, Drs. Trevisan and Serrano, have made application for an Order dismissing any and all punitive damage claims asserted against them by Mr. Aboud.[1]

For the reasons that follow, all of the motions now before this Court shall be denied.

## I. FACTS

In August of 1984, Mr. Aboud received approximately $395,000 as a settlement for severe and permanent injuries sustained in an automobile accident. Mr. Aboud, along with his friends Rita Slayback, Ephrim Bensull and Susanna Bensull, traveled to Atlantic City in February of 1985. It is alleged that from February 15, 1985 through February 18, 1985, Mr. Aboud was a guest at the Caesars Atlantic City Hotel Casino ("Caesars").[2] Mr. Aboud states that on February 19, 1985, he contacted the

---

1. It is unclear from the papers submitted by Drs. Trevisan and Serrano precisely what procedural mechanism their motion to dismiss is predicated upon. We shall assume that they now move for partial summary judgment pursuant to Fed.R.Civ.P. 56.

2. Drs. Trevisan and Serrano maintain that while at Caesars Atlantic City, Aboud enjoyed complimentary hotel accommodations and a credit limit of at least $20,000. Joint Final Pretrial Order ("JFPTO") at 9. Drs. Trevisan and Serrano also allege that in September or October of 1984, Aboud traveled to Las Vegas, Nevada, and during the course of gambling out there, established a line of credit at Caesars Las Vegas and gambled at least $10,000.

Golden Nugget and inquired about "receiving accommodations" at the Golden Nugget. JFPTO at 4. Mr. Aboud checked in that same day, and upon his arrival, was informed by hotel/casino personnel that with a $10,000 deposit with the casino, Mr. Aboud could obtain complimentary lodging during his stay. To take advantage of this offer, Mr. Aboud duly deposited a sum of $10,000, in cash.

Mr. Aboud thereafter came into contact with Michael J. Neustadter, Golden Nugget's Vice President of Customer Development. Mr. Neustadter, who had direct responsibility for the casino's "host" and "credit" departments, arranged for Mr. Aboud to obtain an initial credit line at the casino, as well as several extensions of that credit line, the amounts of which fluctuated over the term of Mr. Aboud's stay. In addition, Mr. Neustadter authorized "comping", that is, supplying on a complimentary basis, the food, beverages and alcohol consumed by Mr. Aboud at the Golden Nugget. At his deposition, Mr. Neustadter explained that the decision to "comp", and the value of goods and services that can be extended to a particular patron, is based on that patron's "level of casino play", which includes such factors as the duration of gambling activities and the average bet made. Mr. Neustadter also authorized the Golden Nugget to provide and pay for Mr. Aboud to be flown by helicopter to his bank in Queens, New York on February 21, 1985, so that Mr. Aboud could withdraw more money and bring it back to Atlantic City.

Mr. Aboud contends that Mr. Neustadter "repeatedly told [him] he must gamble at the casino every night or he would lose the complimentary services and benefits that

were being provided to him," and that he even telephoned Mr. Aboud's room at 4:00 A.M. and "demanded that he gamble." JFPTO at 5. According to Mr. Aboud's account of events, during the entirety of his stay, he consumed complimentary alcoholic beverages whether or not he requested them and as a result, "became visibly intoxicated while [gambling] on the casino floor." JFPTO at 5.

At some point during Mr. Aboud's stay, he is unsure precisely when, Mr. Aboud required medical assistance because of pain emanating from his chest, right knee, jaw and back. Mr. Aboud came under the care of third-party defendants Drs. Trevisan and Serrano, who were provided to Mr. Aboud by the Golden Nugget.[3] According to Drs. Trevisan and Serrano, their involvement with Mr. Aboud occurred on only two occasions: a visit by Dr. Serrano on February 21, 1985 and a visit by Dr. Trevisan on March 1, 1985. On both visits, Mr. Aboud specifically requested a prescription for Percodan, a pharmaceutical product that Mr. Aboud maintains is "a narcotic drug which depresses the central nervous system." Aboud Opposition Brief at 2–3. Both doctors made the Percodan available to Mr. Aboud per his demand, according to Mr. Aboud, without requiring any physical examination, and without reviewing his medical records or consulting with his last treating physician.[4] However, Dr. Serrano asserts that he did in fact conduct a physical examination of Mr. Aboud, wherein he observed multiple scars, difficulty breathing and pain in the jaw. JFPTO at 10. Dr. Trevisan defends by asserting that he reviewed the "history and physical note recorded by Dr. Serrano in their office records" and conducted his own physical examination before renewing Mr. Aboud's

---

**3.** Aboud maintains that both Drs. Trevisan and Serrano are agents, servants and employees of the Golden Nugget, a fact that both doctors firmly deny. *See* Answer to Third Party Complaint filed July 14, 1988. At oral argument, the Golden Nugget explained that the hotel maintains a list of doctors who agree to service its patrons, and the names of Drs. Trevisan and Serrano were culled from this list. The services of these doctors are, however, paid for by the Golden Nugget.

**4.** Dr. Trevisan testified that no attempt was made to contact prior treating physicians because:

> It's very difficult to locate doctors in this county to talk to on the telephone. Also very difficult to contact them. It's very difficult to contact anybody out of state even more so. So that it's impossible to do practically.

Deposition of Louis A. Trevisan, M.D. at 89–18 (quoted in Third Party Plaintiff's Opposition Brief at 5–6).

Percodan prescription. At their respective depositions, both doctors testified that the reason why they complied with Mr. Aboud's request for Percodan was because of Mr. Aboud's recital to them that he had "forgotten his prescription of Percodan at home." Certification of Evelyn C. Farkas, Esquire, counsel for Drs. Trevisan and Serrano, filed December 16, 1988 at 2.

On June 19, 1985, the Golden Nugget initiated this lawsuit against Mr. Aboud to recover a $28,000 debt for casino credits, which Mr. Aboud was unable to repay. A default judgment in the amount of $29,970.19 was entered against Mr. Aboud, but this was later vacated by the Opinion and Order of this Court filed on November 10, 1987. Mr. Aboud filed his Answer on May 2, 1988, which included a three count counterclaim against the Golden Nugget for compensatory damages in the amount of $250,000, together with interest, punitive damages, costs and attorney's fees. This counterclaim alleges fraud and malicious conduct (Count I); unjust enrichment (Count II); and negligence (Count III). The essence of Mr. Aboud's counterclaim is his allegation that the Golden Nugget "fraudulently, intentionally and maliciously procured [Mr. Aboud's] intoxication ... through the offering to him of alcoholic beverages ... at the time Drs. Trevisan and Serrano prescribed a narcotic drug to him, to wit: PERCODAN," in an orchestrated effort to "extract from [Mr. Aboud], in his drugged state, all of his monies." *See* Answer, Counterclaim and Jury Demand. As stated in his Brief:

> As a result of the Percodan which had been supplied by the doctors on call with the Golden Nugget, and the alcoholic beverages which were being provided by various employees and personnel of the Golden Nugget, Mr. Aboud was caused to become sleepy, drowsy, disoriented and handicapped in his ability to reason and comprehend.... While in such a disoriented state, Mr. Aboud was caused

to gamble and lose to the Golden Nugget an amount in excess of $225,000.00.[5]
S/J Opposition at 3.

Put another way, Mr. Aboud is alleging that for the duration of his entire stay at the Golden Nugget, various casino floor employees observed Mr. Aboud gamble in an intoxicated and/or drugged state, and did nothing to stop him from doing so. In fact, Mr. Aboud avers, Rita Slayback and Ephrim Bensull asked certain Golden Nugget personnel to prevent Mr. Aboud from gambling while in such a condition, but that these employees "laughed and ignored their requests." JFPTO at 7. Although the Golden Nugget denies any liability for Mr. Aboud's damages, it has asserted a direct claim against Drs. Trevisan and Serrano for complete indemnification should its liability be adjudged "passive" while the Drs.' liability is adjudged "active."

On May 2, 1988, Mr. Aboud filed a three count Third-party Complaint against Drs. Trevisan and Serrano in their individual capacities. Like the counterclaim against the Golden Nugget, the Third-party Complaint seeks compensatory damages in the amount of $250,000, together with interest, punitive damages, costs and attorney's fees. Mr. Aboud charges the doctors with negligence; they prescribed Percodan "with full knowledge that Golden Nugget would be supplying [Mr. Aboud] with intoxicating alcoholic beverages at the same time." *See* Third-party Complaint. As a result thereof, Mr. Aboud "was deprived of his reason and understanding" which ultimately led to gambling losses. Mr. Aboud alleges these gambling losses to be the damages suffered as a result of medical negligence committed by Drs. Trevisan and Serrano. In addition to denying any liability on their part, they in turn, assert a crossclaim against the Golden Nugget in their Answer for indemnification and/or contribution for any sums recovered by the Golden Nugget if liability is established to be the responsibility of Mr. Aboud. *See* Answer to Third-party Complaint.

*See* JFPTO at 8.

---

**5.** According to the Joint Final Pretrial Order, Aboud assesses his gambling losses at $250,000.

## II. DISCUSSION

### A. *Golden Nugget's Motions for Partial Summary Judgment*

1. Golden Nugget's Responsibility Under Doctrine of Respondeat Superior

The Golden Nugget submits that, even if we were to assume that its employees *did* encourage Mr. Aboud to gamble when they knew he was under the influence of alcohol and Percodan with an intent to goad him into gambling away large sums of money, it cannot be held liable under the doctrine of *respondeat superior* because such conduct would clearly be outside the scope of their employment. The Golden Nugget contends that such activities were not of the variety its employees were hired to perform and that such behavior cannot be said to be actuated by a purpose to serve the master, as all employees working on the casino floor are instructed to

*NEVER* ask a player in the casino if he would like a beverage or a second round.

GNOC Handout, *Casino Floor—Service Procedure* at 29 (quoted in Golden Nugget Brief at 6).

Mr. Aboud maintains that at a minimum, a genuine issue of material fact exists as to whether Golden Nugget personnel were acting within the scope of their employment when they "encouraged, allowed, permitted and supervised Mr. Aboud's gambling ... given [his] physical and mental state." Mr. Aboud Opposition Brief at 10. Mr. Aboud alleges that the dealers and pit bosses, by encouraging him to drink and gamble, were doing *precisely* what they were employed to do and that these actions were actuated by a desire to serve the Golden Nugget since it was the casino itself, and not employees in their individual capacities, that enjoyed the proceeds of Mr. Aboud's gambling losses. We agree that a legitimate factual issue has been raised.

■] According to New Jersey law, an employer may be held liable for the torts of its employees under the doctrine of *respondeat superior* only where that employee is acting within his/her "scope of employment." *Gilborges v. Wallace*, 78 N.J. 342, 351, 396 A.2d 338 (1978). *See also Govern-ment Employees Ins. Co. v. United States*, 678 F.Supp. 454, 456 (D.N.J.1988). To determine the parameters of "scope of employment," New Jersey courts have turned to the Restatement (Second) of Agency § 228 (1957), which provides that:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

\*    \*    \*    \*    \*    \*

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits or too little actuated by a purpose to serve the master.

*Id. See also DiCosala v. Kay*, 91 N.J. 159, 169, 450 A.2d 508 (1982); *Government Employees Ins. Co., supra*, 678 F.Supp. at 456.

At oral argument, the Golden Nugget asserted that Mr. Aboud has presented no evidence that the furnishing of alcoholic beverages to casino patrons in any way serves the Golden Nugget. Rather, Golden Nugget argued, there is no correlation between alcohol consumption and gambling success, and the furnishing of complimentary beverages to patrons while they are in the act of gambling is merely an additional cost which the Golden Nugget must endure.

The Golden Nugget implies that no legitimate business purpose other than developing general goodwill is advanced by its policy of providing "free" drinks to casino patrons. Thus the Golden Nugget concludes that if its employees did in fact urge Mr. Aboud to gamble while inebriated, as alleged, they clearly were not acting within the scope of their employment.

As Mr. Aboud points out, all of his gambling losses inured to the benefit of the Golden Nugget. While pit bosses, dealers and other floor personnel do not reap the fruits of gambling losses in a direct sense, we are not prepared to accept the notion

that casino employees have no incentive to contribute in whatever way they can to their employer's raison d' etre—the realization of profits from gambling activities.

■ On a motion for summary judgment, the court is required to view the pleadings and materials submitted by the parties in the light most favorable to the nonmoving party, and the court must give that party the benefit of all reasonable inferences to be drawn from the facts. *See, e.g., Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976); *Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1093 (3d Cir.1988). We are satisfied that the question of whether or not the conduct of Golden Nugget employees on the casino floor, as alleged, is within their "scope of employment" (as defined in the Restatement (Second) of Agency) raises a genuine issue of material fact which is best resolved by a jury. *See J.L. Querner Truck Lines, Inc. v. Safeway Truck Lines, Inc.,* 65 N.J.Super. 554, 567, 168 A.2d 216 (Law Div.1961) ("where the scope of authority of an employee is a disputed question of fact, the extent of his authority is ordinarily a question of fact for the jury.")

The fact that casino employees are specifically instructed not to offer patrons a "beverage" or a "second round" by management does not insulate the Golden Nugget from all responsibility. As one New Jersey Court has noted, "[w]hen the conduct is activated by a purpose to serve the master, the fact that the act is prohibited by the employer is not determinative of the issue." *Cosgrove v. Lawrence,* 214 N.J.Super. 670, 678, 520 A.2d 844 (Law Div.1986); *National Premium Budget Plan Corp. v. National Fire Ins. Co.,* 97 N.J.Super. 149, 215, 234 A.2d 683 (Law Div.1967).

Thus, Golden Nugget's motion for partial summary judgment on the ground that it cannot be found liable under the doctrine of *respondeat superior* shall be denied.

2. Golden Nugget's Potential Liability for Punitive Damages

■ The Golden Nugget asserts that punitive damages are inappropriate against a corporation for employee/agent misconduct unless (a) the corporation authorized, ratified or participated in committing the act; or (b) the agent who committed, authorized or ratified the act may be considered an "executive" of the corporation. It avers that Mr. Aboud can point to no such high corporate officers or managers at the Golden Nugget (acting within the scope of their employment) who participated in or authorized the actions which form the basis for Mr. Aboud's counterclaim.

Mr. Aboud responds by pointing out that the intentional acts and conduct of Mr. Neustadter were sufficiently "managerial" or "executive" to warrant punitive damages, and that his acts and the acts of Golden Nugget's lower employees (dealers and pit bosses) were ratified by the Golden Nugget in the form of initiating its action to recover the $28,000 gambling debt. Mr. Aboud maintains that Mr. Neustadter was aware of his $395,000 settlement because Mr. Neustadter personally checked his bank accounts. Mr. Neustadter testified at his deposition that he viewed Mr. Aboud as a "unique" and "desperate" man with "personal problems." Deposition of Michael J. Neustadter at 18. Mr. Aboud felt pressured by Mr. Neustadter and other Golden Nugget employees to sign markers (which memorialize extensions of credit), drink and gamble in a very direct, overt way under threat of losing his complimentary privileges:

> ... I don't even know what I'm signing because I—most of the time I was there and I was playing, even prior to the Percodan, they were looking for me all the time to be groggy, to drink, to drink, to drink, to drink so I could play, play, play, play, play and that special one, Michael Neustadter, he was pushing me all the time. You have to play, you have to play. This is not a hotel over here. You got to play, you got to play, you got to play.
>
> And I'm loosing [sic] and I didn't know what I'm doing. I lost my head.

Deposition of Shmuel Aboud at 148. *See also* Aboud Opposition Brief at 14.

Under New Jersey law, punitive damage awards are available to punish or deter

"particularly egregious conduct," that is, an "evil-minded act" or an act accompanied by a "wanton and wilful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 48–49, 477 A.2d 1224 (1984). As the New Jersey Supreme Court has stated, the "key" to obtaining such an award is "the wrongfulness of the intentional act," or put another way, the existence of "wrongful motive." *Id.* at 49, 477 A.2d 1224.

However, punitive damages may not be recovered against an employer for the wrongful acts of its employee "unless the act was specifically authorized, participated in, or ratified by the master." *Winkler v. Hartford Accident and Indemnity Co.*, 66 N.J.Super. 22, 29, 168 A.2d 418 (App.Div. 1961). *See also Security Corp. v. Lehman Assocs.*, 108 N.J.Super. 137, 146–47, 260 A.2d 248 (App.Div.1970). Similarly, a corporate employer may be liable for punitive damages "if its employee who committed the wrongful act or authorized or ratified it was so high in authority as to be fairly considered executive in character." *Winkler, supra*, 66 N.J.Super. at 29, 168 A.2d 418.

We believe that the evidence and allegations presented by Mr. Aboud concerning the acts and conduct of Mr. Neustadter, if taken as true, *see Goodman, supra*, 534 F.2d at 573, present a genuine issue of material fact concerning the propriety of a punitive damage award that is best left to a jury. *See Winkler, supra*, 66 N.J.Super. at 29, 168 A.2d 418 (whether ratifying/authorizing employee is sufficiently "executive in character" is a "fact question"). Should Mr. Aboud present sufficiently credible proofs at trial that Mr. Neustadter is sufficiently cloaked with "executive" authority and that the subject acts Mr. Aboud complains of rise to the level of "particularly egregious conduct," then the Golden Nugget may be answerable for punitive damages. At the very least, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Having found genuine issues for trial, the validity of which will hinge on the credibility and persuasiveness of Mr. Aboud's proofs, partial summary judgment on the punitive damages issue shall be denied.

3. Golden Nugget's Legal Duty For The Foreseeable Gambling Losses of Intoxicated Patrons

In its motion for partial summary judgment with respect to the negligence count of Mr. Aboud's counterclaim, the Golden Nugget urges that it "had no duty recognized by law in ordinary negligence that could create responsibility for Mr. Aboud's gambling losses." Golden Nugget Brief at 14. We disagree. The Golden Nugget submits that "[t]here are no reported cases directly on point," *id.* at 2, and thus it relies extensively on cases which focus on the legal consequences of intoxication by alcohol and narcotics as a matter of contract law. Such dependence is inappropriate where, as here, partial summary judgment is sought against a count of the Complaint whose gravamen sounds solely in tort (negligence). *See* Count III of Counterclaim. Golden Nugget has proffered no compelling analysis of the scope of duty in New Jersey jurisprudence sufficient to persuade this Court that conventional negligence principles do not apply to the facts of this case. The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1985), and we believe that the Golden Nugget has failed to meet this preliminary responsibility.

Under New Jersey law, "[n]egligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." *Rappaport v. Nichols*, 31 N.J. 188, 201, 156 A.2d 1 (1959). However, as a threshold inquiry, the Court must first determine, as a matter of law, "whether a duty exists with respect to the particular claimant." *Huddell v. Levin*, 537 F.2d 726, 734 (3d Cir.1976). As another court stated this principle:

[I]t becomes imperative before legal liability for conceded damages can be imposed upon a defendant, for the court in the first instance to inquire and determine the character of duty which the law under the facts imposed upon the defendant as the basis of liability; for manifestly it cannot be conceded that the jury from their inner consciousness may evolve in every variety of tort feasance a legal duty as the standard of liability.

*Morril v. Morril,* 104 N.J.L. 557, 560–61, 142 A. 337 (1928).

A case may then be submitted to the jury only if such a duty is "declared by the court." *Id.* at 561, 142 A. 337. This preliminary determination is made "by reference to the body of statutes, rules, principles · and precedents which make up the law...." W. Keeton, D. Dobbs, R. Keeton and D. Owen, *Prosser and Keeton on Torts* § 37 at 236 (5th Ed.1984). Our jurisdiction in this case is based upon diversity of citizenship. Consequently, under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must apply the substantive law of the State of New Jersey. Where, as here, the New Jersey Supreme Court has not squarely addressed the critical issue at bar, the federal court sitting in diversity "must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir. 1980). We believe that New Jersey's highest tribunal would apply the tenets of ordinary negligence to the facts at bar.

To find that the Golden Nugget owes a duty to act reasonably under the circumstances, we need not look far. The New Jersey Supreme Court has stated that:

[I]n order to ascertain the existence *vel non* of a duty owed by a defendant, it is necessary to determine whether or not probable harm to one in the position of the injured plaintiff should reasonably have been anticipated from defendant's conduct. Thus, the issue of duty owed to a plaintiff is a question of foreseeability.

*DiCosala, supra,* 91 N.J. at 175, 450 A.2d 508 (citations omitted). *See also Hill v.*

*Yaskin,* 75 N.J. 139, 144, 380 A.2d 1107 (1977) ("the foresight of harm lies at the foundation of the duty to use care."); *Trentacost v. Brussel,* 82 N.J. 214, 223, 412 A.2d 436 (1980) ("[f]oreseeability of harm ... is the crucial factor in determining whether a duty exists.").

Foreseeability is articulated in terms of palpable and identifiable "risk":

[T]he standard of conduct laid down by the law is care commensurate with the reasonably foreseeable risk of harm, such as would be reasonable in the light of the apparent risk; for negligence is essentially a matter of risk, that is to say, of recognizable danger of injury.

*Kahalili v. Rosecliff Realty, Inc.,* 26 N.J. 595, 603, 141 A.2d 301 (1958). *See also Wytupeck v. Camden,* 25 N.J. 450, 461, 136 A.2d 887 (1957).

What is "reasonable in the light of the apparent risk", therefore, is a question of public policy to be resolved by the court. *See e.g. Hill, supra,* 75 N.J. at 148, 380 A.2d 1107 (court's determination of whether a duty exists is "altogether an excursion into the domain of policy.") (citation omitted). In *Wytupeck, supra,* the New Jersey Supreme Court announced that "[d]uty is largely grounded in the natural responsibilities of social living and human relations" which reasonable men would recognize. *Id.* 25 N.J. at 462–62, 136 A.2d 887. Five years later the Court reformulated these public policy concerns and presented a tripartite set of considerations:

Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.

*Goldberg v. Housing Authority of Newark,* 38 N.J. 578, 583, 186 A.2d 291 (1962). *See also McGlynn v. Newark Parking Authority,* 86 N.J. 551, 560, 432 A.2d 99 (1981) ("[u]ltimately ... the imposition of a duty depends upon policy considerations such as the effect of the imposition of the risks and burdens of an activity."). It is important to note that the New Jersey Supreme Court clearly contemplated that the foregoing

concerns would be applied in a malleable, flexible way, with sensitivity to new sets of factual circumstances as those circumstances are presented:

'Duty' is not a rigid formalism according to the standards of a simpler society, immune to the equally compelling needs of the present order; duty must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows; and accordingly the standard of conduct is care commensurate with the reasonably foreseeable danger, such as would be reasonable in the light of the recognizable risk, for negligence is essentially 'a matter of risk * * * that is to say, of recognizable danger of injury.'

*Wytupeck, supra,* 25 N.J. at 462, 136 A.2d 887 (citation omitted).

New Jersey has unambiguously communicated a strong public policy against the noxious potential of excessive alcohol consumption in the twin contexts of common law dram shop liability and statutory/administrative regulation of casino alcoholic beverage service. In so doing, New Jersey has struck a delicate balance between the competing interests we have just discussed, *supra,* and has issued a clear statement about the foreseeability and reasonableness of intoxication related risk and harm.

In *Soronen v. Olde Milford Inn, Inc.,* 46 N.J. 582, 218 A.2d 630 (1966), a wrongful death action, plaintiff's husband died while inebriated after striking his head against a steel column in defendant's tavern. *Id.* at 584, 218 A.2d 630. From these facts, the New Jersey Supreme Court went on to hold that where a patron is "visibly intoxicated", and the tavern keeper continues to serve alcoholic beverages to him despite this apparent condition, the operators of the tavern are subject to liability in common law negligence for the injuries sustained by that intoxicated patron. *Id.* at 593–94, 218 A.2d 630. *See also Holt v. Ferdon Equipment Co.,* 72 F.R.D. 564, 569

(D.N.J.1976) ("In New Jersey, [an intoxicated patron in a tavern] can recover from the tavern for ensuing injury to himself under the 'dram shop' rule.") The Court justified its finding by noting the following:

The imposition of civil responsibility upon a tavern keeper for damages resulting from his negligent service of alcoholic beverages to a visibly intoxicated patron strongly serves the public interest and does not impose any undue burden, for the tavern keeper may readily protect himself by the exercise of reasonable care.

*Id.* at 594, 218 A.2d 630. *See also Buckley v. Pirolo Estate,* 190 N.J.Super. 491, 497, 464 A.2d 1136 (App.Div.1983) *rev'd on other grounds,* 101 N.J. 68, 500 A.2d 703 (1985) ("The essence of the dram shop rule is the protection of the intoxicated patrons and third persons who are in no position to protect themselves").

Superimposed on top of common law dram shop liability is the Casino Control Act, which explicitly proscribes a casino from making alcoholic beverages available to a patron at a gaming table "unless so requested by the patron." N.J.S.A. 5:12–103(g)(1).[6] Furthermore, the regulations promulgated by the Casino Control Commission pursuant to the Casino Control Act, N.J.S.A. 5:12–1, *et seq.* (1977) make it a violation for any holder of a Casino Hotel Alcoholic Beverage License[7] to:

1. Sell, serve, or deliver or allow, permit or suffer the sale, service or delivery of any alcoholic beverage, directly or indirectly ... to any person actually or apparently intoxicated, or

2. Allow, permit, or suffer the consumption of any alcoholic beverage by such [actually or apparently intoxicated] person in or upon its authorized location.

N.J.A.C. 19:50–2.1(a). Under this regulatory scheme, violations committed by an "agent, servant or employee" of the licen-

---

**6.** It is also worth noting that the administrative regulations promulgated by the Casino Control Commission impose a somewhat broader edict, for the regulations require that alcoholic beverages served anywhere in the *"casino room"* must first be requested by the patron.

**7.** A Casino Hotel Alcoholic Beverage ("CHAB") licensee is any person licensed to serve, sell or store alcoholic beverages pursuant to N.J.S.A. 5:12–103. *See* N.J.A.C. 19:50–1.1(c).

see may be imputed directly to the License holder. N.J.A.C. 19:50–4.1(b). Finally, it is worth noting that the regulations also mandate that casinos like the Golden Nugget "shall have on duty at all times when alcoholic beverage service is available at least one person whose duties shall include supervision of all alcoholic beverage service." N.J.A.C. 19:50–3.1(f).

It is clear that the standard of conduct required of the reasonably prudent person may be prescribed by legislative enactment, municipal ordinance or administrative regulation. "When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard ... from which it is negligence to deviate." Prosser, *supra*, § 36 at 220. By imposing a duty upon a casino to act reasonably under the circumstances and prevent obviously intoxicated patrons from gambling, we are merely furthering the public policy goals underlying the Casino Control Act and the regulations promulgated thereunder, which is the protection of gambling patrons from the deleterious effects of alcohol imbibement. In *Galvin v. Jennings*, 289 F.2d 15, 18 (3d Cir.1961), the Third Circuit held, applying New Jersey negligence principles, a tavern owner liable for injuries sustained by an intoxicated person. The Court predicated the existence of a duty on administrative regulations promulgated by the Division of Alcoholic Beverage Control which prohibit its licensee from serving patrons "actually or apparently intoxicated." *Id.* at 17–18. In so doing the Court remarked that these regulations exist "to protect incompetents from their own incompetency." *Id.* Speaking about the potential sources of a standard of care the breach of which would be common law negligence, the Court stated that:

> The proposition is general that a statute, or regulation having force of statute, can establish a standard of care and that one who violates it has therefore acted in a way to create liability if the other elements of a torts case are satisfied.

*Id.*

Many states hold that once a statute is deemed applicable to the facts of a particular case, an unexcused breach of that statute is dispositive of the negligence issue, or is "negligence per se." *See, e.g., Martin v. Herzog*, 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.). New Jersey follows the rule adopted by a minority of jurisdictions, that a statutory or regulatory violation is merely "evidence of negligence" (*prima facie* evidence that the tort feasor's conduct was negligent) which may be accepted or rejected according to all of the evidence. *See, e.g., Braitman v. Overlook Terrace Corp.*, 68 N.J. 368, 385–86, 346 A.2d 76 (1975); *Shatz v. TEC Technical Adhesives*, 174 N.J.Super. 135, 144, 415 A.2d 1188 (App. Div.1980). *See also* Prosser, *supra*, § 36 at 230–31. Thus, from the very fact that particular action or inaction deviates from a statutorily/administratively prescribed standard of care (assuming the plaintiff is within the class of persons the statute or regulation is designed to protect and the harm suffered by the plaintiff is of the kind the statute was intended to prevent), we know, *a fortiori*, a duty exists.

Even if we were to assume, *arguendo*, the applicability of the authorities cited by Golden Nugget, summary judgment would still be inappropriate. Golden Nugget cites several cases standing for the proposition that "a contract made by a person while intoxicated is enforceable, unless the other contracting party *knows* the drunk lacks the capacity to understand or control his acts." Golden Nugget Brief at 9 (emphasis in original). However, at the very most, this merely demonstrates with even greater force, the existence of genuine issues of material fact concerning the degree to which Mr. Aboud's intoxication impaired his comprehension and the extent of Golden Nugget's knowledge of Mr. Aboud's condition. We nevertheless do not see how Golden Nugget's theory impacts or renders nugatory any duty owed to Mr. Aboud in ordinary negligence.

Nor do we see how Golden Nugget's reliance on *Harrahs Club v. Van Blitter*, Civ. No. R–85–267, Civ. No. R–86–21, slip op. (D.Nev. Feb. 17, 1988) (cited in Golden Nugget's Brief at 10, 13) strengthens its

position with respect to duty in ordinary negligence. Golden Nugget asserts that the Nevada District Court flatly rejected a casino's liability in tort for enticing a patron to gamble and then taking advantage of her incompetence at blackjack. Golden Nugget Brief at 10. However, that court did find it relevant and worthy of note that:

> Harrah's had no knowledge of [the patron's] marital discord; nor is there any evidence showing any intent to profit from a psychological weakness.

*Van Blitter, supra,* slip op. at 5. In the case at bar, by contrast, there is evidence of Golden Nugget's knowledge of Mr. Aboud's problems and a reasonable juror could conclude that the casino had the intent to profit thereon. Moreover, *Van Blitter* is distinguishable because it involved a substantially different theory of tort liability than that which was raised in the matter *sub judice.* There, plaintiff argued that the casino "breached its duty to play a fair game" by failing to control her gambling once realizing her incompetence at blackjack, and that the breach was further aggravated by enticing her to gamble more via "comping" her. *Id.,* slip op. at 4. *Van Blitter,* however, did not involve visible intoxication or any allegations of diminished capacity by the plaintiff.

Similarly, the Golden Nugget presents *Claridge, Limited v. Shamy,* No. A–2407–86T7, slip op. (N.J.App.Div. Dec. 8, 1987) to support the proposition that "[i]t would indeed be a novel precedent to allow a jury to decide whether to return money to a gambler who lost it legally while gambling." *Id.,* slip op. at 3–4 (quoted in Golden Nugget Brief at 12). Nevertheless, the issue at bar in *Shamy* was whether "a casino is under a duty to use reasonable care to satisfy itself that a gambler is worthy of credit prior to advancing credit," and not the visible intoxication or diminished capacity of the defendant therein. Also, to conclude that Mr. Aboud lost his money "legally," like the defendant in *Shamy,* puts the cart before the horse—at issue here is precisely how "legal" or "illegal" Mr. Aboud's losses were according to accepted duty and ordinary negligence precepts. Thus, once again, Golden Nugget has raised a question of material fact which must be resolved by a jury.

Our survey of the statutes, rules, principles and precedents which make up the law of the State of New Jersey indicates that the Golden Nugget owes a duty to act reasonably under the circumstances of this case. Such a conclusion is but a logical extension of well established doctrine and pre-existing law, although its application to the facts at bar is novel. Under the circumstances of this case, the Golden Nugget should reasonably have foreseen the type of harm sustained by Mr. Aboud. In a gambling parlour environment, the risk that an obviously intoxicated and/or drugged patron might not appreciate the consequences or substantiality of his endeavors is great. The relevant inquiry is not, as the Golden Nugget suggests, whether a gambler knows that the odds of winning in a casino are against him/her, but rather, whether a gambler comprehends the consequences of continued, protracted gambling. There is nothing fundamentally unfair about imposing upon a casino the duty to prevent patrons such as Mr. Aboud from gambling while patently intoxicated, for they are in the best position to do so. Indeed, casinos are already under an obligation not to serve visibly intoxicated patrons pursuant to New Jersey's common law dram shop liability as well as the statutory framework and administrative regulations which govern alcoholic beverage service in casinos.

In sum, a casino has a duty to refrain from knowingly permitting an invitee to gamble where that patron is obviously and visibly intoxicated and/or under the influence of a narcotic substance. Here there are allegations of patent and overt inebriety coupled with the consumption of a powerful narcotic medication prescribed by physicians summoned by and paid for by the casino itself. While under the influence of drugs or alcohol, one suffers a deficit, to varying degrees, of cognitive faculties such as the power to reason sensibly, to appreciate the danger of activities engaged in, and/or to exercise sound judgment. *Cf. Buckley v. Estate of Pirolo,* 101

N.J. 68, 79, 500 A.2d 703 (1985). The potent effects of intoxicating substances on reasoning and judgment are not lost on casino proprietors like the Golden Nugget who make liquor readily and plentifully available to patrons while they are in the act of gambling. In its brief, the Golden Nugget states that:

> While fresh orange juice may be the beverage of choice within a casino health spa, same is not usually the beverage of choice by patrons of a casino when dining and enjoying fine cuisine, observing stardom, and gambling.

Golden Nugget Brief at 11–12. It is indeed curious that the appropriate "beverages of choice" are seldom available to patrons on a complimentary basis outside of the gambling parlour. Consequently, in justice and fairness, a casino which negligently breaches this duty should be answerable, by applying traditional negligence concepts, for the damages that flow therefrom.

In *People Express Airlines, Inc. v. Consolidated Rail*, 100 N.J. 246, 495 A.2d 107 (1985), a negligence action brought by an airline against various defendants for economic damages without concomitant physical harm, the New Jersey Supreme Court recognized that a tortfeasor who negligently injures a plaintiff or his property "may be liable for all proximately caused harm, including economic losses." *Id.* at 251, 495 A.2d 107. Specifically, the Court held:

> [A] defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury, to particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct. A defendant failing to adhere to this duty of care may be found liable for such economic damages proximately caused by its breach of duty.

*Id.* at 263, 495 A.2d 107. Like the flexibility built into policy determinations concerning the existence *vel non* of a duty, the scope of recoverable economic harm is bound only by reason:

> [T]he courts will be required to draw upon notions of fairness, common sense and morality to fix the line limiting liability as a matter of public policy.

*Id.* at 264, 495 A.2d 107. Having found the existence of a duty and concluded that the type of harm sustained by Mr. Aboud was reasonably foreseeable, it is the exclusive province of a jury to determine whether or not the "breach", "proximate cause" and "damage" elements of the negligence case presently before us have been satisfied.

### B. *Third–Party Defendants' Motion to Dismiss Punitive Damage Claim*

Drs. Trevisan and Serrano posit that punitive damages may be properly awarded only upon a showing of "actual malice" (evil-minded intentional wrongdoing) or "wanton and willful" behavior. *LaBruno v. Lawrence*, 64 N.J.Super. 570, 575, 166 A.2d 822 (App.Div.1960). *See also* our discussion *supra*. They maintain that Percodan was prescribed "to alleviate plaintiff's pain and in no way intended to inflict any physical or financial injury on Mr. Aboud," and that none of Mr. Aboud's factual allegations, even if proven, arise to the level of actual malice or wanton and willful actions.

Mr. Aboud submits that the following facts demonstrate particularly egregious conduct under the test announced in *Berg v. Reaction Motors Div.*, 37 N.J. 396, 414, 181 A.2d 487 (1962): (1) no physical examinations or follow-up examinations were conducted prior to or subsequent to prescribing Percodan; (2) no attempt was made to contact prior treating physicians; (3) the effects of Percodan on Mr. Aboud were not monitored; and (4) no warning or advice concerning the side-effects of Percodan and Percodan/alcohol combinations was offered. Drs. Trevisan and Serrano contend, as we noted *supra*, that physical examinations *were* conducted by both doctors prior to administering the Percodan prescription. JFPTO at 10, 11.

It is clear that punitive damages are available in a medical malpractice action to punish doctors for aggravated or outrageous conduct and to deter future similar conduct. *See, e.g., DiGiovanni v.*

*Pessel,* 55 N.J. 188, 190, 260 A.2d 510 (1970). The record presently before us is insufficient for us to conclude, as a matter of law, that the doctors' activities were so egregious as to warrant the imposition of punitive damages. Consequently, it would be a usurpation of the essential role of the jury to preclude punitive damages before having heard any trial testimony about the conduct of Drs. Trevisan and Serrano. As a result, their motion shall be denied.

### III. CONCLUSION

For the foregoing reasons, the two motions for partial summary judgment filed by the Golden Nugget shall be denied. The application by third-party defendants Drs. Trevisan and Serrano for an Order dismissing any and all punitive damage claims shall also be denied.